**Mrs. Albert TATE et al., Appellants,**

v.

**The BOARD OF EDUCATION OF the JONESBORO, ARKANSAS, SPECIAL SCHOOL DISTRICT, et al., Appellees.**

**No. 19968.**

United States Court of Appeals,
Eighth Circuit.

Jan. 11, 1972.

Margaret A. Burnham, New York City, and John W. Walker, Little Rock, Ark., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, New York City, Frank B. Newell, Walker, Rotenberry, Kaplan, Lavey & Hollingsworth, Little Rock, Ark., for appellants.

Berl S. Smith, Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, and MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

The sole issue before us is whether or not plaintiffs, the parents of two Negro students attending Jonesboro High School and others similarly situated, have been denied their constitutional rights of freedom of speech, due process and equal protection by their suspension from school for a five-day period (later reduced to three days) for violating the school rules by deliberately attending a regularly scheduled pep rally where they knew that the tune "Dixie" would be played and demonstrating by getting up and walking out in violation of the rules of the school. All students had been notified in advance that the tune would be played in the gymnasium and that those not desirous of attending the rally did not have to do so but could report instead to the auditorium. Despite their forewarned notice and option, the offending students deliberately violated established school rules and thereafter they failed and refused to discuss their suspension with school authorities and offered no evidence. in justification at their trial, as will be more detailed hereafter. The case was tried to the district court on a stipulation of facts. The court held that there was no federal question involved and the complaint was dismissed. We affirm the judgment of the district court.

*Factual Background.* Jonesboro High School voluntarily commenced operating a unitary school system in 1966. The school had thus operated as a completely integrated school without any abnormal problems for the first two years of total integration. For many years the playing of the song "Dixie" at pep assemblies had been permitted. For these first two years, black and white students participated in curricular and extracurricular activities together.

At a faculty meeting on September 26, 1968 one of the members stated that a few individual requests had been made to omit the playing of "Dixie" at pep assemblies as the song allegedly was offensive to some Negro students. The school authorities concluded to experiment with the discontinuance of the playing of "Dixie" at pep assemblies but without any notice or publicity. This was done for approximately a month during which time there were complaints from white students and parents about discontinuing playing "Dixie" as it had been on the program for many years. On October 25, 1968 the committee decided to submit the matter to a vote to determine how many students were in favor of the continued use and how many were opposed. The vote being favorable to the playing of the tune, it was announced that thereafter attendance at the pep assemblies would be optional and anyone who did not want to attend could report to the auditorium instead of the gymnasium while pep assemblies were being held.

On November 1, 1968 some twenty-five black students and five white students chose not to attend the scheduled pep rally and reported to the auditorium as instructed. Others went to the gymnasium where the assembly was being held and when "Dixie" was played as the fourth number on the program twenty-nine black students "got up and left the pep assembly in protest of the playing of 'Dixie'." These dissenters did not destroy any property en route to the auditorium. The principal handed them a piece of paper and asked that all who had left the pep assembly sign their names on it. After consulting with other school officials, the superintendent advised the students that the walkout action was deemed disruptive of the school program and they were being suspended for a period of five days for such action. The superintendent and principal then offered to answer any questions which they might have but the suspended students became so loud and unruly that the meeting was terminated.

On November 4, 1968 the parents were advised that the suspension would be reduced to three days for those who would promise the principal privately that when they returned to school they would come to get an education and do something to make the school a better one.

The parents of two of the suspended students instituted this litigation on behalf of their children and other members of their class against the Board of Education of the Jonesboro Special School District and the superintendent and principal of the Jonesboro High School seeking a declaratory judgment to define and determine the rights and other legal relations between the parties. In their original complaint it was not specifically sought to enjoin the playing of "Dixie" at school-related functions but this was sought for the first time by plaintiffs in their brief on appeal.

Defendant school officials denied that the complainants or any members of their class had been intimidated, harassed or unreasonably punished, and asserted that during the 1968 school year friction between the white and black students had noticeably increased. They also alleged that the playing of "Dixie" by the pep rally band and the school band at pep rallies and regularly scheduled athletic events at Jonesboro High School had been a time honored practice, that after discontinuance of playing "Dixie" participation at pep rallies and enthusiasm diminished with resultant loss of student morale and that the experiment they had adopted to eliminate its playing was a failure. They pleaded

affirmatively that they had made an honest, sincere and conscientious effort to operate a completely integrated high school in such a manner as to give all students equal opportunity to receive the best possible education and that the policies, rules and regulations promulgated by them are reasonable and necessary and have been administered in a fair and impartial manner without regard to race, creed or color.

Some months after this litigation was instituted defendants submitted interrogatories to the plaintiffs asking what rights and other legal relations between the parties they sought to have determined and requested a list of the names and addresses of the witnesses they intended to call, but the plaintiffs' answer to all questions was that they had not determined the matters inquired about.

On the date of the trial in Jonesboro, Arkansas neither the plaintiffs nor their attorneys appeared in court.[1]

 Plaintiffs argue first that their departure from the pep rally was symbolic action guarded from suppression by the Free Speech Clause of the First Amendment to the Federal Constitution. For purposes of this opinion, we accept the argument that plaintiffs' actions constituted speech although the problem is somewhat different from Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), where the Supreme Court was dealing with "direct, primary First Amendment rights akin to 'pure speech' " and not with "aggressive, disruptive action or even group demonstrations." (393 U.S. at 508, 89 S.Ct. at 737) First Amendment rights may be infringed upon by reasonable regulations necessary for keeping orderly conduct during school sessions. Blackwell v. Issaquena County Board of Education, 363 F.2d 749, 752 (5th Cir. 1966). A reasonable regulation has been defined as one "which is 'essential in maintaining order and discipline on school property' and 'which measurably contributes to the maintenance of order and decorum within the educational system.' " Blackwell, supra, at 753. The school regulation involved here provided: "It is strictly against the rules to create a disturbance in assembly." Plaintiffs attack the rule as applied to the facts of this case but do not otherwise attack the rule itself. They argue that a "quiet procession" from a pep rally to another authorized place, done as a protest, cannot be prohibited since this conduct is not disruptive. The school officials found that the walkout was disruptive. Inasmuch as the walkout took place during the fourth number on the program and involved twenty-nine students we cannot find that no disruption of school "order and decorum" occurred or that this conduct was a constitutionally protected form of dissent. See Caldwell v. Craighead, Civil No. 5341, M.D.Tenn. May 7, 1969, affirming in part, dismissing in part, 432 F.2d 213 (6th Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 (1971). It is not necessary for school officials to refrain from taking any action until there is a complete breakdown in school discipline such as was involved in Blackwell, supra. They have inherent authority to maintain order and hence have latitude and discretion in formulating rules and regulations and general standards of conduct. Esteban v. Central Missouri State College, 415 F.2d

---

I. "THE COURT: I have heard nothing from Mr. Walker, counsel for the plaintiffs. I was in Little Rock over the weekend where he lives. I have a staff here of five people and we left early to come up here today. This is the only case we had. Frankly, I regard his conduct as outrageous and bordering on contemptuous for the Court because I had no information of any kind until I got here and communicated with you. This has cost us considerable inconvenience and, of course, the Government some additional expense which was wholly unnecessary. "If the stipulation was to be entered into there was no reason why it could not have been done last week or if he had called me yesterday or the day before yesterday and told me that we could have avoided the trip up here today."

1077 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970). The school officials here were dealing with growing student unrest which had already resulted in a scheduled assembly being cancelled.

> "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine. This is not only proper in our opinion but is necessary." *Blackwell, supra,* 363 F.2d at 753.

We cannot say that the district court's finding was clearly erroneous. Caldwell v. Craighead, *supra.*

■ Plaintiffs argue that the district court erred in holding that the suspension did not violate due process. We will assume arguendo that due process applies when a publicly financed educational institution imposes a mild, as well as a severe, penalty upon a student. Farrell v. Joel, 437 F.2d 160 (2nd Cir. 1971). However,

> "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation . . . '"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed. 2d 1230 (1961).

"The 'differing rules of fair play' encompassed by the concept of due process '[vary] according to specific factual contexts * * * and differing types of proceedings.'" Madera v. Board of Education of the City of New York, 386 F. 2d 778, 785 (2nd Cir. 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1416, 20 L. Ed.2d 284 (1968). In these school discipline cases the nature of the sanction affects the validity of the procedure used in imposing it. Farrell v. Joel, *supra,* 437 F.2d at 162. Here, the students were suspended for five days which was reduced to three days for any student who would state privately to the principal that on his return he would come to get an education and "do something to make it a better school." A suspension carries with it a grade reduction of two points of the student's average daily score for each day suspended. However, if this reduction should result in lowering a student's grade as much as two letter grades or cause him to make a failing grade, then the student may do extra work to remove the penalty. There is no contention that any student who failed was refused an opportunity to make up the work or that any suspension caused any failure or otherwise adversely affected the student's over-all grades. When the students were notified of the suspension and the cause for the suspension, they were also offered a question and answer period. Because of the loudness and unruliness of the suspended students the question and answer period was terminated.

We apply the standard of reasonableness in determining whether or not a student has been deprived of his constitutional rights. Jones v. Snead, 431 F. 2d 1115 (8th Cir. 1970); Esteban v. Central Missouri State College, *supra.* We do not regard those cases involving expulsion, see Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), or suspension for a substantial interval, see Wright v. Texas Southern University, 392 F.2d 728 (5th Cir. 1968), as controlling here. Under the circumstances of the case before us, where there was no question as to what acts were involved or what individuals were involved, where notice was given and an opportunity for an informal hearing was given, and where the penalty was mild, there was no violation of due process shown and the district court's holding was not clearly erroneous. Caldwell v. Craighead, *supra.*

■ Finally plaintiffs argue that the lower court's decision denied them equal protection of the laws within the meaning of the Fourteenth Amendment by

refusing to enjoin the playing of "Dixie" at the school assemblies.

Plaintiffs' allegation in support of the requested injunction is that the tune is racially abusive and its playing constitutes officially sanctioned racial abuse; hence the playing of the offensive song forces them not to attend the pep rallies and denies them equal protection of the law.[2] Plaintiffs argue that the First Amendment does not protect the rights of defendants since we "cannot countenance in our public schools officially-sponsored expression of sentiment which defies the law of the Nation." They also urge that "the right to free speech does not give rise to the right to publicly insult or defame. . . ."

At the outset we note that the tune is not shown to be offensive to all blacks even at Jonesboro High School.[3] We reject the idea that the words or the tune of "Dixie" are within that "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. (Footnote omitted.) These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 572, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1942). It is therefore necessary to look at the history of the song to determine whether the song is racially abusive.

"*Dixie.*" There is many a myth about "Dixie" as well as claims of authorship and there have been many variations of its lyrics by various people. There seems to be little doubt, however, that the song was written prior to the Civil War by Daniel Decatur Emmett, a native of Ohio, as a "walk-around" for a minstrel show. It is best described as a "typical American song with a gay and catchy tune." See *Sampler of American Songs*, a Copyright 1969, by Maymie R. Krythe, a book narrating the "background and lore connected with 18 of our most famous and beloved American songs." At page 100, the author states:

"Over a century ago (1859) Daniel Decatur Emmett, an American minstrel performer and composer, wrote both the words and music for 'Dixie,' a typical American song with a gay and catchy tune. Although he was a Northerner, his song won immediate popularity.

. . . . . .

"At the beginning of the Civil War, 'Dixie' was taken over by the Southerners as their Confederate battle song. But today all sections of our great country sing 'Dixie,' termed one of 'the most rollicking of our national songs,' known and loved throughout the world."

Referring to "Dixie" as "Emmett's masterpiece," the author noted that it has been given much praise by various writers. She also states that Louis C. Elson, in *The National Music of America*, emphasized that "'Dixie' was a great favorite of the Civil War President, Abraham Lincoln, as well as of the Northern soldiers, pointing out that 'it was one of the most characteristic melodies that sprang from the epoch of the war, although written as a picture of peace and happiness'" and that "[t]he contagious nature of its melody helped to bring about its rapid spread and popularity." Lincoln had used the tune prior to the War as one of his campaign songs, and after the War was over he asked the Marine Band to play it at the White House.

Emmett and others composed new lyrics to be used by the Northern Army and lyrics were also written by other songwriters in the South, but the original lyrics are all that have survived. The song was written as the result of a request by Jerry Bryant that Emmett

---

2. Only the tune without words was played.

3. The total enrollment of blacks was approximately 105. Of this number 25 were in attendance in the school auditorium and 29 more walked out of the pep rally. The views of the remaining 51 are not shown.

compose a walk-around to be used as a final number two days hence in the Bryant Minstrels. Emmett had been very successful with his own troop, being an accomplished musician as well as a singer, and had taken his minstrel show to Europe where it was not so successful. He returned to this country broke and found some competition in that Bryant and others had entered into the minstrel business and Emmett was forced to seek employment with Bryant Minstrels.

The minstrel show was purely an American form of entertainment, the principal actors being the interlocutor, who acted as master of ceremonies, and the star performers were two end men —"Mr. Bones" and "Mr. Tambo"—the names having been derived from the instruments they played, the ivory bones or clappers and the tambourine.

In his contract with Bryant Minstrels Emmett was required " 'to hold himself in readiness to compose for them a new "walk-around," whenever called upon to do so, and to sing the same at the close of their performance.' " The detail of how the famous song was written has been preserved as one of Emmett's fellow minstrels wrote about it in his diary and Emmett also left an account of its creation.

It was the custom for each performance of a minstrel show to end with a "walk-around," during which all the members of the company joined in songs and dances. One Saturday night when Bryant Minstrels was performing in Mechanics Hall in New York City, Mr. Bryant told Emmett that he needed a new "walk-around" for the show on the following Monday and that it must be ready for that morning's rehearsal. The following day as Emmett sat shivering in a drab New York boardinghouse trying to compose a song he grumbled to his wife, "I wish I was in Dixie." There has been much speculation on the origin of the word "Dixie," but Emmett said that many showmen, when they were in the cold North, had referred to

the south as "Dixie," and longed to be there, and that was what he, Emmett, was thinking about. He could not get the thought out of his mind and as he struggled to write a song for the show this became the first line of his new and unforgettable hit.

Mrs. Krythe noted that Arthur Farwell and W. D. Darby, in their book *Music in America*, paid this tribute to Emmett's song:

" 'The music of "Dixie" is so pleasing to the people that it has become almost a universal tune without words.

" 'Its beginning was in the minstrel show; it was dedicated as a battle song in the great uprising of the South; and in its last estate it has a place among the enduring music of the Union.' "

"Dixie," as originally written, had five stanzas but the first one is the one that has survived and it was also the only one of the stanzas that the minstrel producers chose to have sung without dialect. There have been many claims to authorship but, as far as can be determined, Emmett is the only one to actually get a United States copyright for the song. It did him little good and Emmett sold his copyright for a pittance.[4] In later years few people realized that Emmett was still alive until 1895 when Edward Bok, editor of the *Ladies Home Journal*, called attention to the fact in an editorial in which he characterized Emmett as "the venerable and retired minstrel," and stated that the author of "Dixie" was alive, but poor, and almost forsaken. Fortunately, according to Mrs. Krythe, Emmett lived long enough to see "Dixie" win "universal acclaim" all over the United States. Many people helped to make his last years more comfortable and gave him the recognition he deserved. He died in 1904 at his farm near Mount Vernon, Ohio and was buried in Mound View Cemetery. Many gathered to honor him, and as his casket was lowered into its grave a band played his well-known composition.

4. Arkansas Gazette, Dec. 8, 1968, at 4A, col. 1.

**982**

On this record we cannot say that the tune "Dixie" constitutes a badge of slavery or that the playing of the tune under the facts as presented constituted officially sanctioned racial abuse. Such a ruling would lead to the prohibition of the playing of many of our most famous tunes.

The atmosphere on the campus had been so tense as to cause the school principal in an address to the student body on October 21, 1968 to say, "presently on our campus there are cries of 'Black Power,' I suppose 'White Power,' . . ." and warn the students against such declarations under pain of being dealt with as disrupting the school. The action taken by the school authorities obviously averted serious trouble and was not only practical but clearly and properly within the rights of the school officials if we are to have any discipline in our public schools. Court intervention could in such situations only serve to fan the embers of unrest. The court should never interfere except where there is a clear case of constitutional infringement. *Cf.* Freeman v. Flake, 448 F.2d 258 (10th Cir. 1971). This is not such a case.

Accordingly, the judgment is affirmed.