**Mark Stephen SHANLEY, by Next Friend, et al., Plaintiffs-Appellants,**

v.

**NORTHEAST INDEPENDENT SCHOOL DISTRICT, BEXAR COUNTY, TEXAS, etc., et al., Defendants-Appellees.**

No. 72–1264.

United States Court of Appeals, Fifth Circuit.

June 9, 1972.

Rehearing Denied June 29, 1972.

**964**

Gerald H. Goldstein, San Antonio, Tex., Leonard J. Schwartz, ACLU of Ohio, Columbus, Ohio, for San Antonio Civil Liberties Union.

Maury Maverick, Jr., San Antonio, Tex., for Texas Civil Liberties Union.

Emerson Banack, Jr., San Antonio, Tex., for defendants-appellees; Foster, Lewis, Langley, Gardner & Banack, San Antonio, Tex., of counsel.

Before WISDOM, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

It should have come as a shock to the parents of five high school seniors in the Northeast Independent School District of San Antonio, Texas, that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's rights of expressing their thoughts. We trust that it will come as no shock whatsoever to the school board that their assumption of authority is an unconstitutional usurpation of the First Amendment.

Appellants, Mark S. Shanley, Clyde A. Coe, Jr., William E. Jolly, John A. Alford, and John Graham, were seniors at MacArthur High School in the Northeast Independent School District of San Antonio. At least they were students there save for a period of three days during which they were suspended for violating a school board "policy." Each of the students here was considered a "good" or "excellent" student. All were in the process of applying for highly competitive slots in colleges or for scholarships. The three days of zeros that resulted from the suspensions substantially affected their grade averages at a critical time of their educational careers.

The occasion of the suspension was the publication and distribution of a so-called "underground" newspaper entitled "Awakening." The newspaper was authored entirely by the students, during out-of-school hours, and without using any materials or facilities owned or operated by the school system. The students distributed the papers themselves during one afternoon after school hours and one morning before school hours. At all times distribution was carried on near but outside the school premises on the sidewalk of an adjoining street, separated from the school by a parking lot. The students neither distributed nor encouraged any distribution of the papers during school hours or on school property, although some of the newspapers did turn up there. There was absolutely no disruption of class that resulted from distribution of the newspaper, nor were there any disturbances whatsoever attributable to the distribution. It was acknowledged by all concerned with this case that the students who passed out the newspapers did so politely and in orderly fashion.

The "Awakening" contains absolutely no material that could remotely be considered libelous, obscene, or inflammatory. In fact, the content of this so-called "underground" paper is such that it could easily surface, flower-like, from its "underground" abode. As so-called "underground" newspapers go, this is probably one of the most vanilla-flavored ever to reach a federal court.

The five students were suspended by the principal for violation of school board "policy" 5114.2 which reads in pertinent part:

"Be it further resolved that *any* attempt to avoid the school's established procedure for administrative approval of activities such as the production for distribution and/or distribution of pe-

titions or printed documents of *any* kind, sort, or type without the specific approval of the principal shall be cause for suspension and, if in the judgment of the principal, there is justification, for referral to the office of the Superintendent with a recommendation for expulsion . . . "

Northeast Independent School District "policy" 5114.2 at 2–3, adopted November 20, 1969 [emphasis added].[1]

1. The entire text of "policy" 5114.2, including an appended Texas statute on "disruption," reads as follows:

*Policies on Disruptive Activities and Unauthorized Publications*

In keeping with the policy of this district to maintain, at all times, a proper learning situation, the Board of Trustees hereby establishes what will be known as Policies on Disruptive Activities and Unauthorized Publications.

Whereas several non-school organizations have publicized their intent to involve students in school boycotts for the purpose of focusing attention on the various concerns of these individual organizations and

Whereas any distraction on a school campus works against the achievement of educational objectives and against the best interests of the entire student body and faculty and

Whereas any non-approved loss of instructional time endangers a school's ability to meet accreditation standards and jeopardizes the value of scholastic records of all students and

Whereas there is in existence in the schools of the North East District a structure for student government which provides opportunity for constructive involvement of all students in discussion and expression of opinion on appropriate topics and

Whereas students and their parents have access to communication with the administration in individual schools and with the Central Office administration and

Whereas there exists in each of the schools of the North East District many varied opportunities for student participation in school organizations and

Whereas the established curricular offerings of the North East District include opportunities for students to develop communicative skill in creative arts,

Be it resolved that any student who participates in a boycott, sit-in, stand-in, walk-out, or other related form of unauthorized activity shall by this action be subject to suspension or expulsion and

Be it further resolved that any attempt to avoid the school's established procedure for administrative approval of activities such as the production for distribution and/or the distribution of petitions or printed documents of any kind, sort, or type without the specific approval of the principal shall be cause for suspension and, if in the judgment of the principal there is justification, for referral to the Office of the Superintendent with a recommendation for expulsion and

Be it further resolved that any staff member who initiates by his instruction or who supports by his position any student or any group of students who are involved in disruptive activity shall be subject to disciplinary action by the Superintendent and the Board of Trustees.

In addition to the above policies those disruptive activities which are specified and defined in House Bill 141 of the 1969 Session of the Texas Legislature (as shown immediately following this paragraph) shall be cause in this school district for suspension or recommendation for expulsion as appropriate in the judgment of the principal of the school concerned.

PROHIBITING CERTAIN DISRUPTIVE ACTIVITIES IN PRIVATE OR PUBLIC SCHOOLS OR INSTITUTIONS OF HIGHER EDUCATION

'Section 1. No person or group of persons acting in concert may willfully engage in disruptive activity or disrupt a lawful assembly on the campus or property of any private or public school or institution of higher education or public vocational and technical school or institute.

'Sec. 2. (a) For the purposes of this act, "Disruptive activity" means:

'(1) obstructing or restraining the passage of persons in an exit, entrance, or hallway or any building without the authorization of the administration of the school;

'(2) seizing control of any building or portion of a building for the purpose of interfering with any administrative, educational, research, or other authorized activity;

'(3) preventing or attempting to prevent by force or violence or the threat of force or violence any lawful assembly authorized by the school administration;

The students requested a hearing before the full school board, which was transcribed by a court reporter at the students' request and expense. Counsel for the students and the school board were present at the hearing. The students argued before the board that, after consulting with an attorney and a professor at a local law school, they had concluded that the regulation in question simply did not apply to conduct exercised entirely outside school hours and off school premises.[2]

The school board affirmed the suspensions one day later.

Objecting to the school board's bootstrap transmogrification into Super-Parent, the parents of the five affected students sought both temporary and permanent injunctive relief as next-friends in the federal courts, requesting that the

'(4) disrupting by force or violence or the threat of force or violence a lawful assembly in progress; or

'(5) obstructing or restraining the passage of any person at an exit or entrance to said campus or property or preventing or attempting to prevent by force or violence or by threats thereof the ingress or egress of any person to or from said property or campus without the authorization of the administration of the school.

'(b) For the purposes of this Act, a lawful assembly is disrupted when any person in attendance is rendered incapable of participating in the assembly due to the use of force or violence or due to a reasonable fear that force or violence is likely to occur.

'Sec. 3. A person who violates any provision of this Act is guilty of a misdemeanor and upon conviction is punishable by a fine not to exceed $200 or by confinement in jail for not less than 10 days nor more than 6 months, or both.

'Sec. 4. Any person who is convicted the third time of violating this Act shall not thereafter be eligible to attend any school, college, or university receiving funds from the State of Texas for a period of two years from such third conviction.

'Sec. 5. Nothing herein shall be construed to infringe upon any right of free speech or expression guaranteed by the Constitutions of the United States or the State of Texas.'

Students and parents are advised that, in addition to the school administrative procedures, school officials, wherever deemed advisable, will initiate complaints with legal authorities against any person or persons who violate HB 141 or any of its terms."

2. Counsel for the school board insisted in his brief and during oral argument that the students here sought confrontation, desiring the attendant publicity. If that were true, the students would find themselves in a precarious position. It is not part of the learning process in high school to challenge regulations, however questionable, by confrontation and suit in federal court. School regulations are best left to be resolved at the local level, where the problems are more familiar to those involved and the procedures are more personal. The students are, asking for relief that is equitable in nature, and, as in any equity suit, they must come with "clean hands." If there are administrative procedures to clarify or to challenge the questioned regulation, then those procedures should be tried first See Quarterman v. Byrd, 4 Cir. 1971. 453 F.2d 54; Blackwell v. Issaquena County Board of Education, 5 Cir. 1966. 363 F.2d 749. However, we feel that counsel for the school board substantially misrepresented the students in this case. Despite substantial questioning by the board's counsel during the school board hearing regarding the suspensions, the students maintained convincingly that they honestly and reasonably interpreted the regulation as inapplicable to the course of conduct that they had followed. In addition, even if there might be some other internal administrative regulation that the students might have used to get an authoritative interpretation or to appeal any interpretation of "policy" 5114.2, and we have no such regulation in the appellate record, there is overwhelming testimony in the transcript of the school board hearing that no such mechanism was ever brought to the attention of the student body. The error of judgment by the students in engaging in their conduct without first consulting school authorities, if it were indeed an error in judgment, is much less objectionable than the concomitant error in judgment by the school board. While the students perhaps failed to recognize the intended scope of the regulation as actually applying to conduct exercised completely out of school and off school premises, the school board likewise failed to recognize even the bare existence of the First Amendment when it first drafted that part of "policy" 5114.2 which is involved in this appeal.

school board be enjoined from entering the zeros into the students' permanent records and from prohibiting the distribution of the "Awakening" off campus and outside school hours. The district court denied all relief, dismissing the case on its own motion as "wholly without merit." [3] The district court also denied the students' request for an injunction pending appeal to this court, F.R.Civ.Pro. 62(c), and the students immediately appealed. On an emergency basis this court expedited the appeal and enjoined the school board from entering the zeros that resulted from the suspensions into the students' records and from refusing to afford the students a reasonable opportunity to complete and submit for academic credit the work that they had missed as a result of the suspensions, pending this appeal. F.R.App.Pro. 8; F.R.Civ.Pro. 62(g).[4]

■ That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions. *See e. g.,* Burnside v. Byars, 5 Cir. 1966, 363 F.2d 744; Blackwell v. Issaquena County Board of Education, *supra;* Ferrell v. Dallas Independent School District, 5 Cir. 1968, 392 F.2d 697, cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125; Karr v. Schmidt, 5 Cir. 1972 (en banc), 451 F.2d 1023. This court laid to rest more than a decade ago the notion that state authorities could subject students at public-supported educational institu-

tions to whatever conditions the state wished. Dixon v. Alabama State Board of Education, 5 Cir. 1961, 294 F.2d 150, cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. And of paramount importance is the constitutional imperative that school boards abide constitutional precepts:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted."

West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 1637. The school board insists that "policy" 5114.2 is constitutional both "on its face" and "as applied" to the suspensions meted out under the circumstances of this case.

■■ This case is anomalous in several respects, a sort of judicial believe-it-or-not. Essentially, the school board has submitted a constitutional fossil, exhumed and respired to stalk the First Amendment once again long after its substance had been laid to rest. Counsel for the school board insists vigorously that *education is constitutionally* embraced solely by the Tenth Amendment, leaving education entirely without the protective perimeters of the rest of the Constitution. We find this a rather quaint approach to the constitutional setting of education in light of West Virginia State Board of Education v. Barnette, *supra;* Tinker v. Des Moines In-

3. The district court's order reads as something of a hybrid: part dismissal, F.R. Civ.Pro. 12(b) (6), part summary judgment, F.R.Civ.Pro. 56(b), part "abstention," part equity, and part a denial of federal question jurisdiction, 28 U.S.C.A. § 1331.

4. With regard to high school discipline cases, one district court has hypothesized a distinction between "major" and "minor" penalties, the former subject to judicial review and the latter presumably too *de minimis* for application of constitutional standards. Soglin v. Kauffman, W.D. Wis.1968, 295 F.Supp. 978, aff'd., 7 Cir. 1969, 418 F.2d 163. While we intimate

no view with regard to the overall propriety of this distinction, we merely observe that the "magnitude" of a penalty should be gauged by its effect upon the student and not simply meted out by formula. For example, a suspension of even one hour could be quite critical to an individual student if that hour encompassed a final examination that provided for no "make-up." We are convinced here that the three-day suspensions issued to these five high school seniors, who were in the process of applying to and interviewing for college admission and for scholarships, constitute a justiciable penalty under any "major"/"minor" dichotomy.

dependent Community School Dist., 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Brown v. Board of Education of Topeka (*Brown I*), 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Brown v. Board of Education (*Brown II*), 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884; Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19; Aaron v. Cooper, 8 Cir. 1958, 261 F.2d 97; Griffin v. Prince Edward County School Board, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 754, to cite only a few cases.[5] Even the educational progeny of Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, held that the manner in which a state operated its public school system *must* be subject to constitutional review. *See e. g.*, Missouri ex rel. Gaines v. Canada, 1938, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 1950, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. The recent cases involving so-called "underground" newspapers or other modes of expression in high schools relate almost entirely to the circumstances under which a school board can constitutionally limit expression *during* class hours and *on* school premises. *See, e. g.*, Burnside v. Byars, *supra*; Tinker v. Des Moines Independent Community School Dist., *supra*; Eisner v. Stamford Board of Education, 2 Cir. 1971, 440 F.2d 803; Scoville v. Board of Education of Joliet Twp., 7 Cir. 1970, 425 F.2d 10; Riseman v. School Committee of Quincy, 1 Cir. 1971, 439 F.2d 148. Our case involves the less difficult question

of conduct that is removed from the school milieu in exercise and in effect. Since school boards have rarely asserted the breadth of authority that the Northeast School District "policy" attempts to assert here, the constitutional standards are not entirely embraced by precedent. It is clear, however, that the authority of the school board to balance school discipline against the First Amendment by forbidding or punishing off-campus activity cannot exceed its authority to forbid or punish on-campus activity. Therefore, we must first examine the authority of the school board to order the actions of students *on* school grounds and *within* school hours.

█ While a school is certainly a market-place for ideas, it is just as certainly not a market place. The educational process is thwarted by the milling, mooing, and haranguing, along with the aggressiveness that often accompanies a constitutionally-protected exchange of ideas on the street corner. There is, of course, a substantive difference between schools and the street corner in terms of weighing the sometimes competing interests of a completely free flow of any and all expression with the requirement that there be order and discipline. Thus, this court has endeavored to give "careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner." Ferrell v. Dallas Independent School Dist., 392 F.2d at 704–705 (Godbold, J., specially concurring). Because high school students and teachers cannot easily disassociate themselves from expressions directed towards them on school property

5. The district court apparently agreed with counsel for the school board. Although citing *Burnside* as applicable to this case, the district court concluded:
 "The Court refuses to hold that the Federal Courts have Constitutional power to interfere and intrude in the manner that the public school systems are operated by the respective sovereign States."
 Shanley v. Northeast Independent School Dist., W.D.Tex.1972, Case No. SA–72–CA–48 [February 2, 1972]. We find this refusal unacceptable in light of the plethora of cases involving school systems. A trial court is sometimes confronted with the prospect of applying laws from a legislative body or a high court that do not fit four-square with its own interpretations. But proper application under those circumstances is, to our understanding, the single most important guiding principle of law and of orderly process well back into our Anglo-Saxon legal heritage.

and during school hours, because disciplinary problems in such a populated and concentrated setting seriously sap the educational processes, and because high school teachers and administrators have the vital responsibility of compressing a variety of subjects and activities into a relatively confined period of time and space, the exercise of rights of expression in the high schools, whether by students or by others, is subject to reasonable constraints more restrictive than those constraints that can normally limit First Amendment freedoms.[6]

There is nothing unconstitutional per se in a requirement that students submit materials to the school administration prior to distribution. *See* Eisner v. Stamford Board of Education, *supra*. Given the necessity for discipline and orderly processes in the high schools, it is not at all unreasonable to require that materials destined for distribution to students be submitted to the school administration prior to distribution. As long as the regulation for prior approval does not operate to stifle the content of any student publication in an unconstitutional manner and is not unreasonably complex or onerous, the requirement of prior approval would more closely approximate simply a regulation of speech and not a prior restraint. Nor is there anything unconstitutional per se in a reasonable administrative ordering of the time, place, and manner of distributing materials on school premises and during school hours:

"In formulating regulations, including those pertaining to the discipline of school children, school officials have a wide latitude of discretion. But the school is always bound by the require-

ment that the rules and regulations must be reasonable. It is not for us to consider whether such rules are wise or expedient but merely whether they are a reasonable exercise of the power and discretion of the school authorities . . . . But, with all of this in mind, we must also emphasize that school officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, *where the exercise of such rights in the school buildings and schoolrooms do not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.*"

Burnside v. Byars, 363 F.2d at 748–749 [emphasis added], *cited with approval in* Tinker v. Des Moines Independent Community School District, *supra*.

When the constitutionality of a school regulation is questioned, it is settled law that the burden of justifying the regulation falls upon the school board. Tinker v. Des Moines School District, *supra*; Burnside v. Byars, *supra*; Scoville v. Board of Education of Joliet Twp., *supra*.[7] The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise "materially and substantially" interferes with the activities or discipline of the school. *See* Burnside v. Byars, *supra*; Tinker v. Des Moines Independent Community School Dist., *supra*. The purpose of any screening regulation, at least in theory, is to prevent disruption and not to stifle expression.

6. For example, we doubt that a school board could not restrain the sort of inflammatory and vitriolic exhortation that was protected by the Supreme Court in Terminiello v. Chicago, 1949, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, in the context of a speaking engagement before paying adults.

7. We see no reason to toy with *Tinker's* placement of that burden on the school board when the regulation is alleged to have been unconstitutionally applied rather than unconstitutional on its face: first, since it is the school board that asserts the right to curtail presumptively protected activity, the board should bear the burden of establishing why; and second, the school board presumably has the essential information that led it to conclude that the activity had to be curtailed.

Thus, the school board does not have a difficult burden to meet in order to justify the existence of a prior screening rule. *See, e. g.,* Eisner v. Stamford Board of Education, *supra.* However, the board cannot rely on *ipse dixit* to demonstrate the "material and substantial" interference with school discipline. Put another way, *Tinker* requires that presumably protected conduct by high school students cannot be prohibited by the school unless there are

" . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities. . . ."

Tinker v. Des Moines Independent Community School Dist., 393 U.S. at 514, 89 S.Ct. at 740, 21 L.Ed.2d at 742.

 Under the First Amendment and its decisional explication, we conclude that: (1) expression by high school students can be prohibited altogether if it materially and substantially interferes with school activities or with the rights of other students or teachers, or if the school administration can demonstrate reasonable cause to believe that the expression would engender such material and substantial interference; (2) expression by high school students cannot be prohibited solely because other students, teachers, administrators, or parents may disagree with its content; (3) efforts at expression by high school students may be subjected to prior screening under clear and reasonable regulations; and (4) expression by high school students may be limited in manner, place, or time by means of reasonable and equally-applied regulations.

## I.

 When the *Burnside/Tinker* standards are applied to this case, it is beyond serious question that the activity punished here does not even approach the "material and substantial" disruption that must accompany an exercise of expression, either in fact or in reasonable forecast. As a factual matter there were no disruptions of class; there were no disturbances of any sort, on or off campus, related to the distribution of the "Awakening." *See* Shanley v. Northeast Independent School Dist., W.D.Tex.1972, Case No. SA–72–CA–48 [February 2, 1972]. Disruption in fact is an important element for evaluating the reasonableness of a regulation screening or punishing student expression. In a companion case to *Burnside,* this court held that conduct presumptively-protected in *Burnside* itself was not protected by the First Amendment when it was accompanied by disorderly and raucous distribution. Blackwell v. Issaquena County Board of Education, *supra.* One week after *Tinker* the Supreme Court denied certiorari in a case that had involved rather violent and disruptive activity by some college students. The district court found that the students had exceeded their constitutional privileges of free expression, Barker v. Hardway, S.D. W.Va.1968, 283 F.Supp. 228, affirmed, Barker v. Hardway, 4 Cir. 1968, 399 F.2d 638. In the Supreme Court's denial of review, Mr. Justice Fortas, who wrote for the majority in *Tinker,* observed in concurrence that "the petitioners . . engaged in an aggressive and violent demonstration, and not in peaceful nondisruptive expression," Barker v. Hardway, 1969, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217.

 The "reasonable forecast" of disruption that might result from the exercise of expression is a more difficult standard to apply. It is not necessary that the school administration stay a reasonable exercise of restraint "until disruption actually occur[s]." Butts v. Dallas Independent School Dist., 5 Cir. 1971, 436 F.2d 728, 731. *Accord* Norton v. Discipline Committee of East Tennessee State University, 6 Cir. 1969, 419 F.2d 195, cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562; Quarterman v. Byrd, 4 Cir. 1971, 453 F.2d 54. Nor does the Constitution require a specific rule regarding every permutation of student conduct before a school administration may act reasonably to prevent dis-

ruption. *See* Eisner v. Stamford Board of Education, *supra*; Richards v. Thurston, 1 Cir. 1967, 424 F.2d 1281. The Northeast school board has made our task of applying *Tinker's* "reasonable forecast" test somewhat easier here since, in substance, the board does *not* on appeal defend its suspensions on the basis of disruptions, either potential or actual. However, *giving the board the benefit* of every doubt in the instance of the application of one of its disciplinary rules, we note that there is some testimony in the record of the school board hearing that the school administration believed the contents of the "Awakening" to be potentially disruptive.[8] Perhaps this point was not pressed on appeal precisely because it is fraught with constitutional dangers. *See* Near v. Minnesota ex rel. Olson, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357. The "Awakening" contains no remarks that could remotely be considered obscene, libelous, or inflammatory, and protection has been afforded to publications much more hortatory than the one before this court. *See* Quarterman v. Byrd, *supra*. We do not here delimit the categories of materials for which a high school administration may exercise a reasonable prior restraint of content to only those materials obscene, libelous, or inflammatory, for we realize that specific problems will require individual and specific judgments. There-

fore, in deference to the judgment of the school boards, we refer ad hoc resolution of these issues to the neutral corner of "reasonableness." We do conclude, however, that the school board's burden of demonstrating reasonableness becomes geometrically heavier as its decision begins to focus upon the content of materials that are not obscene, libelous, or inflammatory. The best that can be said for the administration's concern in this case is that two topics mentioned in the "Awakening" are "controversial" in the community. Yet it should be axiomatic at this point in our nation's history that in a democracy "controversy" is, as a matter of constitutional law, never sufficient in and of itself to stifle the views of any citizen:

> "The vitality of civil and political institutions in our society depends on free discussion . . . . [I]t is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes."

Terminiello v. Chicago, 1949, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, 1134–1135; *see also* Brooks v. Auburn Univ.,

---

8. One may also exceed his or her constitutional rights of expression by adopting a method of expression that materially and substantially interferes with the rights of others or with the conduct of school actvities. *See, e. g.*, Blackwell v. Issaquena Board of Education, supra; Barker v. Hardway, supra; Tate v. Board of Education of Jonesboro, 8 Cir. 1972, 453 F.2d 975. The more active the methodology of expression, the more inherent its potential interference. Although passing out newspapers is a more active mode of expression than the wearing of buttons, *see* Burnside v. Byars, supra; Tinker v. Des Moines Independent Community School Dist., supra, and therefore subject to greater disruptive potential, the *Tinker* rationalization of the First Amendment and high school discipline has been held applicable to various so-called active forms of expression,

including the distribution of high school newspapers. *See, e. g.*, Eisner v. Stamford School Dist., supra; Scoville v. Joliet Twp. School Dist., supra; Sulivan v. Houston Independent School Dist., supra; Quarterman v. Byrd, supra. All parties to this case agree that distribution of the "Awakening" was polite, orderly, and non-disruptive. None of the students tried to force papers on anyone; no one attempted to block ingress or egress to a building; students were, in fact, discouraged from taking the papers onto the school grounds. The distributors of the "Awakening" merely handed newspapers to those who wished to read them, nothing more. We find nothing whatsoever in the means of distribution followed by these students that is offensive to the rights of others or potentially disruptive in a material and substantial way to the conduct of school activities.

M.D.Ala.1969, 296 F.Supp. 188, aff'd, 5 Cir. 1969, 412 F.2d 1171. The two "controversial" subjects in the "Awakening" are a statement advocating a review of the laws regarding marijuana and another statement proffering information on, among other things, birth control.[9] We find the allegedly outrageous and "controversial" nature of these two subjects rather peculiar. Encouragements to become informed of social issues are certainly not the "fighting words" of Chaplinsky v. New Hampshire, 1941, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, words that inherently prompt only divisiveness and disruption. Indeed, the President's Commission on Marijuana has advocated precisely what the "Awakening" is said to advocate, only the Commission did so in much stronger terms. And the school librarian testified at the school board hearing that a large number of books and newspapers on file for all students to read deal with the subject of birth control. We might add that a casual glance at any public medium would assure even the most doubtful observer that the general subjects of marijuana and birth control are rather widely-discussed. It appears odd to us that an educational institution would boggle at "controversy" to such an extent that the mere representation that students should become informed of two widely-publicized, widely-discussed, and significant issues that face the citizenry should prompt the board to stifle the content of a student publication. Perhaps newer educational theories have become in vogue since our day, but our recollection of the learning process is that the purpose of education is to spread, not to stifle, ideas and views. Ideas in their pure and pristine form, touching only the minds and hearts of school children, must be freed from despotic dispensation by all men, be they robed as academicians or judges or citizen members of a board of education.

■ One of the great concerns of our time is that our young people, disillusioned by our political processes, are disengaging from political participation. It is most important that our young become convinced that our Constitution is a living reality, not parchment preserved under glass.[10] Almost thirty years ago the

9. The assertedly objectionable parts of the "Awakening" read as follows:

"An estimated 23 million Americans have smoked marijuana including 43% of all college students. Under the existing laws all of them could go to jail. Smoking marijuana isn't the issue, unjust laws are.

NORMAL

(National Organization for the Reform of Marijuana Laws) For information write

• • • •

NORMAL
Washington, D. C.,
2105 N Street Northwest."

* * * * * *

"For information & treatment of
A. V.D.
B. Birth Control
C. Food & Nutrition
D. General Medical Treatment
E. Psychological Aid
F. Drug Counseling
G. Draft Counseling
San Antonio Free Clinic
Call . . . . . . . . . . 733–0383."

10. The school administration also expressed concern at what it believed to be the "negative" attitude of the newspaper and at the criticism, overt and covert, of the school administration. "Negativism" is, of course, entirely in the eye of the beholder, and presumably the school administration's eye became fixed upon the criticism by the students. As those to whom public and private criticism, of widely varying degrees of intention and rationality, has been directed, we can say with some pained assurance that "criticism," like "controversy," is not a bogey, at least not in a democracy. Of course, constructive criticism is far more helpful than any other sort of critique. But almost any effort to explain a different mode of operation or approach serves to illuminate the issue being questioned. If the criticism is irrational or ill-intentioned, then surely the American citizenry, even that of high school age, will have enough good sense to attach that much more credibility to the criticized actors and their actions. Without discussing any ramifications, since no discussion is compelled, suffice it to say that aversion to "criticism" is not a constitutionally reasonable justification for forbidding the exercise of First Amendment expression.

Supreme Court noted that boards of education

" . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

West Virginia State Board of Education v. Barnette, 319 U.S. at 637, 63 S.Ct. at 1185, 87 L.Ed. at 1637. It is incredible to us that in 1972 the First Amendment was deemed inapplicable under these circumstances to high school students living at the threshold of voting and dying for their country.

 We have discussed potential disturbance a great deal, for in substance that is what school discipline is designed to prevent. However, we must emphasize in the context of this case that even reasonably forecast disruption is not *per se justification* for prior restraint or subsequent punishment of expression afforded to students by the First Amendment:

"[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . ; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."

Tinker v. Des Moines Independent Community School Dist., 393 U.S. at 508–509, 89 S.Ct. at 737, 21 L.Ed.2d at 739.[11] Reasonable regulation of expression is constitutionally preferable to restraint:

"[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. [citing cases]. There is no room under our Constitution for a more restrictive view."

Terminiello v. Chicago, 337 U.S. at 4, 69 S.Ct. at 896, 93 L.Ed. at 1135; *see also* Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. If the content of a student's expression could give rise

---

The First Amendment's protection of speech and expression is part of the Bill of Rights precisely because those governed and regulated should have the right and even the responsibility of commenting upon the actions of their appointed or elected governors and regulators.

11. *But cf.* Karr v. Schmidt, supra, where the majority concluded that the possibility that short-haired students might physically challenge long-haired students was an acceptable reason for *r.* prior re-

straint upon the length of students' hair. *See* Massie v. Henry, 4 Cir. 1972, 455 F.2d 779, for a different treatment of the same argument. However, *Karr* was premised upon the holding of the majority that long hair was not in that instance a constitutionally-protected mode of expression within the contours of the First Amendment. No one seriously questions that a newspaper is not a presumptively-protected mode of expression within the First Amendment.

to a disturbance from those who hold opposing views, then it is certainly within the power of the school administration to regulate the time, place, and manner of distribution with even greater latitude of discretion. And the administration should, of course, take all reasonable steps to control disturbances, however generated. We are simply taking note here of the fact that disturbances themselves can be wholly without reasonable or rational basis, and that those students who would reasonably exercise their freedom of expression should not be restrained or punishable at the threshold of their attempts at expression merely because a small, perhaps vocal or violent, group of students with differing views might or does create a disturbance.

We realize that each situation involving expression and discipline will create its own problems of reasonableness, and for that reason we do not endeavor here to erect any immovable rules, but only to sketch guidelines. We emphasize, however, that there must be demonstrable factors that would give rise to any reasonable forecast by the school administration of "substantial and material" disruption of school activities before expression may be constitutionally restrained. While this court has great respect for the intuitive abilities of administrators, such paramount freedoms as speech and expression cannot be stifled on the sole ground of intuition. Thus, while we do not wholly disparage the comment of the MacArthur High School assistant principal in this case that the "attitude" of the school could somehow have changed during the mini-crisis that was assertedly engendered by the appearance of the "Awakening," we feel certain that the school administration can appreciate the fact that we must viewpoint unless it is substantiated by some objective evidence to support a reasonable "forecast" of disruption or by actual disruption. There is simply no demonstable evidence whatsoever that the circumstances surrounding the distribution of the "Awakening" amounted to or could reasonably have been forecast

to amount to a "material and substantial" disruption of school activity or discipline.

Although the students urge the argument, we do not feel it necessary to hold that *any* attempt by a school district to regulate conduct that takes place off the school ground and outside school hours can never pass constitutional muster. *See* Wright, The Constitution on Campus, 22 Vand.L.Rev. 1027. This court has evaluated situations involving off-campus activity and has required a fair hearing in such instances, Dixon v. Alabama State Board of Education, *supra*, but we have never had occasion to discuss the contitutional propriety of applying a school regulation directly to off-campus conduct. *See* Sullivan v. Houston Independent School Dist., *supra*. We do note, however, that it is not at all unusual to allow the geographical location of the actor to determine the constitional protection that should be afforded to his or her acts. For example, the now-proverbial "fire" might be constitutionally yelled on the street corner, but not within the theater; or a march down the middle of a street might be protected activity, while a march down the hallway of a building might not. By the same token, it is not at all unusual in our system that different authorities have responsibility only for their own bailiwicks. An offense against one authority that it perpetrated within the jurisdiction of another authority is usually punishable only by the authority in whose jurisdiction the offense took place. Thus, contrary to the district court's opinion, the width of a street might very well determine the breadth of the school board's authority. Students, as any other citizens, are subject to the civil and criminal laws of the community, state, and nation. A student acting entirely outside school property is potentially subject to the laws of disturbing the peace, inciting to riot, littering, and so forth, whether or not he is potentially subject to a school regulation that the school board wishes to extend to off-campus activity. In our case the distribution of

the "Awakening" was entirely off-campus and was effected only before and after school hours. The distribution was orderly and polite, and no disruption actually occurred or was reasonably foreseeable under the circumstances. Thus, we hold here only that the exercise of disciplinary authority by the school board under the aegis of "policy" 5114.2 was unconstitutionally applied to prohibit and punish presumptively-protected First Amendment expression that took place entirely off-campus and without "substantial and material" disruption of school activities, either actual or reasonably-foreseeable. Therefore, the Northeast Independent School District is enjoined from entering any zeros upon the permanent records of these five students that resulted from the unlawful suspensions or from preventing the students from making up work missed during the suspensions. We decline to enjoin the school board from prohibiting distribution of the "Awakening" under any and all circumstances, and we see no need under the traditional bases of equitable remedies to issue a protective injunction against the board. As we have made clear in this opinion, the balancing of expression and discipline is an exercise in judgment for school administrations and school boards, subject only to the constitutional requirement of reasonableness under the circumstances. We decline to attempt to conjure and transcribe every possible permutation of circumstances regarding the distribution of the "Awakening," and we have complete faith that the school board and the school administration will make every effort to abide by the Constitution.

## II.

■ However, under the circumstances of this case and this appeal, we are compelled to proceed further with "policy" 5114.2. Recognizing the close distinction between "unconstitutional as applied" and "facially unconstitutional as overbroad," we are nevertheless compelled to declare the regulation in question facially unconstitutional as both

overbroad and vague, and also as a denial of procedural due process. We do so with great hesitation and regret. But we do so in the interests of the sound judicial administration of this case and of those cases that might reasonably arise under the "policy" in question. In this case, in fact, the school board does *not* base its primary arguments on appeal upon potential or actual disruption of school activities. Rather, the board chooses to assert that the suspensions of these five students are valid simply because the students allegedly violated "policy" 5114.2. Especially if the regulation is the sole rationale for punishment, the regulation must have a rationale constitutionally sufficient on its face. *See* Eisner v. Stamford Board of Education, *supra.*

Counsel for the school board argues on appeal that the regulation should be upheld facially because it *could* be interpreted in a reasonable manner. Counsel then proceeds to advocate a school board interpretation that is thoroughly unreasonable. Passing over the fact that the school board in this appeal has relied to a remarkable degree upon the conditional verb "could," we simply note that it is the school board's own actions that demonstrate most convincingly that the regulation is both overbroad and vague, and, therefore, constitutionally infirm on its face. Put another way, it is the school board's response to the circumstances involved in the distribution of the "Awakening" that has convinced us that counsel for the students is correct in urging that a facial approach to "policy" 5114.2 is required of this court.

■ We conclude that the regulation is overbroad: (1) because it purports to establish a prior restraint on any and all exercise of expression by means of the written word on the part of high school students at any time and in any place and for any reason; and (2) because it contains no standards whatsoever by which principals might guide their administrative screenings of "petitions or printed documents of any kind, sort, or type."

There is absolutely no requirement in "policy" 5114.2 that the proscribed activity of attempting to publish or distribute "any printed document" relate in any way whatsoever to maintaining the orderly conduct of school activities. The regulation in question does not facially lend itself to any limitation in terms of intent, time, or geography to what should be its principal concern—the sound administration of the school. It is true, as the school board insists on appeal, that freedom of expression is not an absolute and that expression must, on occasion, be balanced against other constitutional considerations. However, in insisting that expression be "balanced" the school board neglects to suggest what the ballast on the other side of the constitutional scales should be. The Second Circuit in Eisner v. Stamford Board of Education, *supra,* confronted a regulation regarding prior restraints on student publications and implied that the regulation there might be constitutional on its face as a matter of overbreadth. But the regulation in *Eisner* was at least school-oriented, whereas "policy" 5114.2 is life-away-from-home regulatory:

> "The policy [of *Eisner*] does not in any way interfere with students' freedom to disseminate and to receive material outside of school property; nor does it threaten to interfere with the predominate responsibility of *parents* for their children's welfare."

Eisner v. Stamford Board of Education, 440 F.2d at 808 [emphasis in text]. If there were some limiting language in the "policy," we would be very much inclined to pretermit this holding. Unfortunately there is no such limitation, and the school board's action here has confirmed our worst fears regarding the variations of interpretation that could pervert the regulation. When questioned at the school board hearing regarding the scope of the "policy," the assistant principal of MacArthur High School responded:

> "I think that any student publication should be presented to us and since

this is broad, I think it is left up to a Principal's good judgment. For approval, any student publication, as far as time and miles, or feet, or blocks, if this is what you are interpreting it is left up to the good judgment of the school administrator."

At the district court hearing the school superintendent generally agreed with this assessment of the scope of the policy. We repeat that we do not derogate the "good judgment of the school administrator" in any way whatsoever. But the Constitution can be no more loosely interpreted because the motivations behind its infringement may be benign. Because that part of "policy" 5114.2 that deals with the publication and distribution of materials, by its terms and by the announced administrative interpretations accorded it, sweeps protected activity wholly outside the school context along with proscribed activity, the "policy" is facially overbroad and unconstitutional to that extent. *See* Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444; Hobbs v. Thompson, 5 Cir. 1971, 448 F.2d 456; *see also* NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405.

The "policy" is also facially overbroad because there are no standards whatsoever by which a principal may accept or reject a student publication or distribution. It appears that some petitions or documents of a political nature, regarding a pending school bond election, were distributed at MacArthur High School with the blessing and even the encouragement of the administration and the school board. We have absolutely no way of discerning on what basis those documents were accepted while the "Awakening" was not, or why a student may pass around the "San Antonio Light," which might have a number of informational or advocative stories on marijuana laws or on birth control, or on any other "controversial" subject, but not the "Awakening." We do not doubt in any manner the existing and continuing good faith of the school administration and the school board in attempt-

ing to enforce discipline by means of "policy" 5114.2. But our constitutional system does not permit any school board or administrator, however well-intentioned, to be the unaccountable imperator of the lives of our children. We cannot withdraw from the Constitution to the extent that the intellectual training of school-aged minds utterly escapes First Amendment rights and responsibilities. The mere statement of the potential penumbral invasion contemplated by this "policy" shudders the conscience of those to whom the First Amendment is sacred. It can be negated by benevolent, though perhaps misguided, satraps of our schools. In order to remedy this element of overbreadth, the thrust of the "policy" in question must include guidelines stating clear and demonstrable criteria that school administrators should utilize to evaluate materials submitted to them for prior clearance and distribution. We have discussed earlier the problems involved in attempts to regulate content for content's sake, and we reemphasize it at this point only to encourage the school board to seek administrative resolution of these content problems before cases reach the federal courts. *See* Riseman v. School Committee of Quincy, *supra.*

In addition, we must conclude that the regulation in question is unconstitutionally vague because the blanket prohibition against "distributions" or "attempts to distribute" does not reflect any reasonable, constitutional standards of the First Amendment as applied to the orderly administration of high school activities. The language of "policy" 5114.2 regarding what is intended by "distribution" is such that reasonable men not only can differ and have differed, but *should* differ substantially as to its meaning. *See* Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; *see also* Baggett v. Bullitt, 1964, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377. There is no intimation, let alone a requirement, that any proscribed "distribution" must interfere in a material and substantial way with the administration of school activity and discipline. In fact, the assistant principal of MacArthur High School conceded under interrogation at the board hearing that one student handing *Time* magazine to another student without the permission of the principal was presumptively in violation of "policy" 5114.2, and the school superintendent agreed with that evaluation of the "policy" at the district court hearing. *See* Eisner v. Stamford Board of Education, *supra,* for discussion of a very similar vagueness problem. If the school board here can punish students on the strength of this blunderbuss regulation for passing out any printed matter, off school grounds, outside school hours, and without any disruptions whatsoever, then why cannot the school board also punish any student who hands a Bible to another student on a Saturday or Sunday morning, as long as it does so in good faith? We resist the temptation to answer. In order to remedy its vagueness, the policy in question must include guidelines stating the relationship between the prevention or curtailment of "distribution" and the prevention of material and substantial disruption of school activities that the "policy" seeks to remedy.

Finally, we must conclude that the regulation in question is unconstitutional as a matter of due process. There is no provision in "policy" 5114.2, nor, to our knowledge, in any other school regulation, allowing for appeal from the decision of the school principal not to permit distribution and specifying a time period during which the principal or the appellate board must make their decisions. The occasions calling for the exercise of various forms of protected speech are fleeting, and lack of clarity or a delay in implementation of screening regulations carry the inherent danger that the exercise of speech might be chilled altogether during the period of its importance. Imprecision and delay serve only to underscore the fact that the constitutional ideal can be thwarted in petty ways, a frustrating experience in a democracy. Any regulation that proposes

to screen and to sift out publications distributable to high school students under a regulation purporting to prevent substantial and material school disruption must: (1) state clearly the means by which students are to submit proposed materials to the principal or school administration; (2) state a brief and reasonable period of time during which the principal or administration must make their decisions; (3) state clearly a reasonable appellate mechanism and its methodology; and (4) state a brief and reasonable time during which the appeal must be decided. *See* Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649; *see also* Eisner v. Stamford Board of Education, *supra*; Stacy v. Williams, N.D.Miss.1969 (three-judge court), 306 F.Supp. 963. Because "policy" 5114.2 contains none of these procedural safeguards, and because we can find no other regulation in the record before us that contains such safeguards, "policy" 5114.2 must be declared unconstitutional on its face insofar as it purports to restrain expression without provision for timely administrative appeal.

*Tinker's* dam to school board absolutism does not leave dry the fields of school discipline. This court has gone a considerable distance with the school boards to uphold its disciplinary fiats where reasonable. *See, e. g.,* Blackwell v. Issaquena School Dist., *supra*; *cf.* Karr v. Schmidt, *supra*; Ferrell v. Dallas Independent School Dist., *supra. Tinker* simply irrigates, rather than floods, the fields of school discipline. It sets canals and channels through which school discipline might flow with the least possible damage to the nation's priceless topsoil of the First Amendment. Perhaps it would be well if those entrusted to administer the teaching of American history and government to our students began their efforts by practicing the document on which that history and government are based. Our eighteen-year-olds can now vote, serve on juries, and be drafted; yet the board fears the "awakening" of their intellects without reasoned concern for its effect upon school

discipline. The First Amendment cannot tolerate such intolerance. This case is therefore reversed for entry of an order not inconsistent with this opinion.

Reversed.

CLARK, Circuit Judge (specially concurring):

I concur in all of Judge Goldberg's opinion except that portion of Part II holding that due process requires that school authorities not only provide a prompt administrative decisionmaking process for regulation of student expression, but also that they must create an administrative appellate mechanism as a part of such review process.

Although I agree that if school authorities provide for administrative appeals, such appeals must be prompt in decision and reasonable in procedure, I do not agree that such administrative appeal procedures are constitutionally bound to exist.