Donna THOMAS; John Tiedeman, by and through his parents Mr. & Mrs. Henry Tiedeman; David Jones, by and through his parents Mr. & Mrs. John E. Jones; Richard Williams, by and through his parents Mr. & Mrs. Arthur F. Williams, Plaintiffs,

v.

BOARD OF EDUCATION, GRANVILLE CENTRAL SCHOOL DISTRICT; William E. Butler; Don L. Miller; Frederick J. Reed; Beverly Tatko; Robert L. Flower; Terry M. Knipes; Walter Perry, III; Frank P. Villano; Donald Binck; Marie Vanderminden; and Theresa McCauliffe; each Individually and in their official capacities, Defendants.

No. 79–CV–80.

United States District Court, N. D. New York.

May 2, 1979.

On Motion for Final Injunction June 6, 1979.

Richard Emery, New York Civil Liberties Union, New York City, for plaintiffs; Richard B. Wolf, Albany, N.Y., of counsel.

Caffry, Pontiff, Stewart, Rhodes & Judge, Glens Falls, N.Y., for defendants; H. Wayne Judge, Glens Falls, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

JAMES T. FOLEY, Chief Judge.

In the hearing held on a motion for a preliminary injunction in this civil rights action, it was testified that there was nothing to do in Granville in the dreary winter months and certain junior and senior students in Granville Junior-Senior High School decided to start a newspaper. Granville is a rural community of about 3,000 population in Washington County, New York. One student testified there was no entertainment for them, and the composition, publication and distribution of a newspaper or magazine seemed to be the proper outlet for their energies. Although there was no testimony concerning the subject, it must be assumed the historic village of Granville and its high school had the usual high school sports, dances, and academic activities. Of course, the rugged winter temperature invited ice fishing, ice skating, skiing, tobogganing, and other outdoor activities of that kind.

The students, however, persisted in their newspaper idea, and the result was a xeroxed 13-page newspaper entitled "Hard Times". Plaintiffs' Exhibit 1 in evidence at the hearing. If the winter was becoming too dull in Granville, the distribution and sale of this newspaper, with its complete sexual format and content, on the streets and places near the high school to its students, changed that dullness and stirred the small village from any winter slumber it may have been in. The newspaper gives the best description of the content with the slanted banner across the front page "Uncensored—Vulgar—Immoral! ! !". The front page notes in large caps "Special Editorial"—and that reference is to the next page: "EDITORIAL: A Close-up on Masturbation", a detailed writing in blunt wording. There is no need to describe the remainder of the content except to say that throughout it follows along the same line of expression. Anyway, the content immediately upset parents of students and the school authorities, as being shocking, vulgar, and filthy. It should be noted that this was also the initial reaction of the parents themselves of the student plaintiffs. The outgrowth of all this was the imposition of disciplinary measures after careful consid-

eration and interviews by the school authorities. The plaintiffs challenge this action of the school authorities, claiming that their First Amendment rights of free speech had been violated in the suppression of this unauthorized newspaper.

It is hard for my mind to accept with equanimity the proposition that this high school adventure, similar to the expected high school pranks that often occur, rises to the stature of a federal constitutional case. The consequences of the students' conduct, and it should hardly be characterized as entertainment, was to be witnesses in a federal civil action here in Albany, at which the school administrators and teachers were compelled to take the witness stand as well as to be deposed at the Granville Junior-Senior High School. A concomitant result was the students' absence from their regularly scheduled classes; and, the administrators' absence from their important educational and administrative responsibilities. Moreover, the case attracted newspaper and television coverage.

The problem, in my judgment, seems particularly one for solution within the public education system of New York which is noted for its safeguards and reviews in matters of this kind. I am confident that as the years go on, this escapade will be the prime topic of discussion at class reunions.

In *Goss v. Lopez,* 419 U.S. 565, 589–590, 95 S.Ct. 729, 744, 42 L.Ed.2d 725 (1975), the dissenting opinion of Justice Powell noted:

[T]his Court has explicitly recognized that school authorities must have broad discretionary authority in the daily operation of public schools. This includes wide latitude with respect to maintaining discipline and good order. . . . Such an approach properly recognizes the unique nature of public education and the correspondingly limited role of the judiciary in its supervision.

■ The limited role of the judiciary in the supervision of public education, therefore, arises only in those instances where the resolution of conflicts in the administration of a school system directly implicates fundamental constitutional values. *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *See generally, Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

In this action, the parties have thrust this Court into the educational "thicket" as a consequence of disciplinary action taken against four high school students arising out of their preparation and distribution of "Hard Times," an unauthorized, or so-called underground ten-page newspaper or magazine which is, at best, a crude attempt to create sensational high school news in a small rural high school, and, at worst (at least in the eyes of the defendants), a patently offensive and vulgar attempt to enter the high school newspaper world. The plaintiffs through their counsel argue that the disciplinary measures imposed upon them by the school authorities violate their constitutional rights under the First and Fourteenth Amendments.

The plaintiffs, Donna Thomas, John Tiedeman, David Jones and Richard Williams, juniors and senior in Granville Junior-Senior High School, three of whom are represented by their parents because of their minority, commenced this action for declaratory and injunctive relief by the filing of a complaint on February 6, 1979. That complaint also sought temporary injunctive relief. The defendants are: the Board of Education of the Granville Central School District; the members of the Board; William E. Butler, Principal of the Granville Junior-Senior High School; Frederick J. Reed, the Assistant Principal; and, Donald L. Miller, District Principal for the Granville Central School District.

■ Plaintiffs base their claim for relief upon 42 U.S.C. § 1983, and, its jurisdictional counterpart, 28 U.S.C. § 1343(3). At present, there is no basis for entertaining a claim for relief directly under the First Amendment with 28 U.S.C. § 1331(a) as a jurisdictional predicate. *See Turpin v. Mailet,* 591 F.2d 426 (2d Cir. 1979). *See also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 396, 99 S.Ct. 1171, 1175, 59 L.Ed.2d 401 (1979).

A chronological recitation of the proceedings in this Court and the factual background is set forth:

This Court heard oral arguments on the application for temporary restraining order on Tuesday, February 6, 1979. At that time, the Court denied injunctive relief as it was sought regarding the discipline imposed upon the students; namely, the five-day suspension, of which only one day remained at the time of the hearing, and, the segregation of the students from the remaining student body in separate study halls for the month of February. The Court did enjoin the school officials from directing the students to write an essay on the subject "Potential Harm to People Caused by the Publication of Irresponsible and/or Obscene Writing." Finally, the Court signed an order to show cause for a hearing upon a preliminary injunction to be held February 21, 1979.

On Friday, February 9, 1979, plaintiffs sought leave of the Court to take depositions of certain defendants. This motion was made returnable on Monday, February 12, 1979, at which time the Court granted plaintiffs' motion as well as defendants' oral cross-motion for leave to take the depositions of certain plaintiffs. Those depositions were taken at the Granville Junior-Senior High School on February 14 and 15, 1979.

At the February 21, 1979, Court Hearing, plaintiffs called eight witnesses, the defendants four witnesses, those being the principal defendants in the action. The only issues addressed at the hearing centered upon the First Amendment inasmuch as plaintiffs' first amended complaint, filed February 20, 1979, specifically withdrew any claims in the original complaint based upon the Due Process Clause. *See Goss v. Lopez,* *supra,* 419 U.S. 565, 95 S.Ct. 729.

As gleaned from the supporting depositions, affidavits and testimony of the parties at the hearing, these essential facts were shown not to be disputed.

The students, Donna Thomas, John Tiedeman, David Jones and Richard Williams, conceived of the idea of creating a satirical and racy publication during November and December 1978. By their own testimony, it was their purpose to create something analogous to the National Lampoon, a monthly magazine of national circulation, the content of which is heavily weighted toward spoofs of sexual behavior. Enthused with this basic conception, the four students began discussing the subject during their after school study hours. These "thought" sessions usually were conducted in the classroom of one of their teachers, George Mager; and, continued throughout most of January 1979.

During the course of their discussions, planning and formulation of the publication, these students also solicited ideas and assistance from their fellow students. As the newspaper, eventually known as "Hard Times," approached the stage of definite publication, portions of the new journalistic endeavor were carried out on school grounds with the admitted use of school property. That is, it is clear in the record that some of the writing, typing, editing and ultimately the storing of the paper occurred within the school.

Moreover, there is no dispute, and I find that George Mager's role in his contact with the newspaper effort was superficial to a great extent and limited largely to matters of correct punctuation, spelling and grammatical usage. He was aware of some parts of the content, and did not see the completed issue of the paper that was sold to the students on streets and locations near the school. It is noted and found that Mr. Mager advised the students that certain items could lead to trouble and suggested that they be deleted, especially the Editorial. In all fairness to Mr. Mager, there is evidence that he never really thought that any publication would eventually materialize; and, when it did become a reality, as noted, he was unaware of its final content. He did allow the paper to be stored in his classroom, a commitment he had made and did not withdraw upon learning that the paper was a reality. Professor Mager did admit he may have been guilty of poor judgment, and it is apparent he did not perceive the commotion that was to arise.

The record also discloses that the photo-copying of "Hard Times" was done at the office of a local manufacturing company, presumably by a friend of Donna Thomas. Approximately one hundred issues were photocopied and stapled.

There is some evidence in the record that Mr. Mager advised the students to sell "Hard Times" away from school; and that, in fact, approximately seventy copies were sold to students at Stewart's, a nearby store. There is some evidence that some issues may have been sold on school grounds. It is noted that the students testified that it was their policy not to sell "Hard Times" because of its own description of being vulgar to students in the seventh and eighth grades because they probably would not understand the attempted satirical nature of the contents. There is no evidence that any seventh or eighth graders purchased or were found possessing an issue of the paper, although the junior and senior high school students share the same school facilities.

The time frame for distribution of "Hard Times" was January 23–26, 1979. Inevitably, a copy of "Hard Times" surfaced in the school building on Wednesday, January 24. The paper had been taken from a ninth grade student by a teacher, who, at the end of the school day, brought it to the office of the high school principal, defendant Butler.

Upon reading it, the immediate response of Dr. Butler was to speak privately with District Principal Miller. This conversation took place that same afternoon of January 24; and, it was decided then that they would wait for further copies to appear as well as to monitor the photocopying equipment in the school's administrative offices. No further immediate action was taken by defendants Butler and Miller in their capacities as Principal and School Superintendent due to the fact that, at this time, they had no knowledge of the source of "Hard Times;" and, more importantly, school-wide examinations were scheduled for Thursday and Friday, the administration of which would occupy most of their attention and energies, and should not be disrupted.

Although defendants Butler and Miller then were without knowledge as to the source of "Hard Times," defendant Reed, the Assistant Principal, knew its origins on January 24, the day on which the first issue showed up in the school. He could do so because of two events which took place approximately one week prior to the appearance of the paper.

The first such episode involved a brief conversation with Mr. Mager wherein the latter asked defendant Reed whether he had heard any rumors about a student publication. At that time, Mr. Mager disclosed the names of three students—Tiedeman, Williams and Jones—plaintiffs herein. No description of the contents of the paper was given.

Defendant Reed responded to this information by requesting John Tiedeman to come to his office. They talked about the general subject of a student publication. Mr. Reed related that the school was unconcerned about what the students did away from school. His concern was that some disciplinary action could be taken if there was some involvement on school grounds. Mr. Reed's other stated concern was to apprise John Tiedeman about the feelings of others, the nature of humor, and, the use of names of teachers and students which might lead to embarrassment and indignation. Generally, Mr. Reed's purpose was to discourage the students from publishing a paper since an underground newspaper published a number of years earlier resulted in disciplinary suspensions of the students involved. Nevertheless, when John Tiedeman left the office, Mr. Reed had no way of knowing whether a paper would be published or not. But, when an issue did surface the following week, he immediately had a good idea of its origins.

There is evidence to the effect that following this conversation with Mr. Reed, substantial portions of "Hard Times" were edited by the students to excise those portions which used students' names (a rumor column).

On Monday, January 29, defendants Butler and Miller renewed their investigation

regarding "Hard Times." Beverly Tatko, President of the Board of Education, saw an issue and requested to see Superintendent Miller because she was shocked by its content. In the office of Mr. Miller, with Dr. Butler present, she inquired about the newspaper, its circulation in school and what Mr. Miller and Dr. Butler intended to do about it. She stated that the paper was the worst thing she had ever seen. She also professed knowledge of Mr. Mager's participation in the paper, as well as knowledge of the names of the students involved. There were no discussions concerning disciplinary action, although Mrs. Tatko thought herself that discipline should be imposed. She did state, however, that if Dr. Butler and Mr. Miller did not feel as strongly about the paper as she did, then perhaps there should be a meeting of the Board of Education. To that end, she distributed and caused to be distributed, copies of "Hard Times" to the members of the Board of Education that same day. It is a fair assessment of the facts to conclude that the investigatory efforts of Dr. Butler and Mr. Miller became more intensive following the meeting with Mrs. Tatko. Mr. Miller did state, however, that it was his own decision to hold a Board meeting on Tuesday and Wednesday.

The course of the investigation began on Monday morning with Dr. Butler questioning Mr. Mager on the extent of his knowledge and participation in the preparation of "Hard Times." This conversation confirmed the extent of Mr. Mager's previously stated knowledge and involvement with it. At that time, Dr. Butler took the copies that were left in Mr. Mager's storage closet.

Later that morning, Dr. Butler and Mr. Miller interviewed three of the students— Tiedeman, Williams and Jones. These conversations confirmed the facts concerning the preparation, publication and distribution of "Hard Times" as outlined above. Subsequent to these discussions, Donna Thomas was called to Dr. Butler's office; and, she similarly confirmed the accounts given by Tiedeman, Jones and Williams.

Dr. Butler also learned from these initial meetings that other students participated in the creation of "Hard Times" to varying degrees. Those students were interviewed on the following day, Tuesday, January 30.

At the end of the meetings with the principals on Monday, Dr. Butler and Mr. Miller reached a decision to have a meeting with the School Board and the parents of the students. The purpose was to find out whether the parents had discovered any facts regarding "Hard Times" which were different from or supplementary to those already discovered.

Following this meeting between Dr. Butler and Mr. Miller, all of the students, except Donna Thomas, requested to speak with Dr. Butler. The request was granted, and, the discussions reflected the students' anxiety as to the consequences of their conduct. Dr. Butler informed them that their conduct would be judged by the fact that school property and facilities were involved in the creation and distribution of "Hard Times." There was some discussion concerning suspension.

At the conclusion of the first meeting of parents, admittedly shocked themselves upon a first reading of the newspaper, the Board of Education, Mr. Miller and Dr. Butler, a decision was reached, outside the presence of parents, that suspensions should be imposed upon the key actors. This decision was not premised upon the violation of any particular rule concerning publication of student newspapers; but, instead, was based upon a uniform consensus, including the parents, that the students had done something wrong. In fact, there are no written school rules concerning student publications.

The Wednesday, January 31 meeting with the parents of those students having only minor involvement was conducted without the School Board, presumably, the latter deciding that the principals in the publication and distribution of "Hard Times" was their principal concern. No discipline was imposed upon the students with minor involvement.

The five-day suspensions of Tiedeman, Jones, Williams and Thomas was said to be officially premised upon Regulation No.

5114. The propriety of the suspension it is contended is supported by N.Y.Ed.Law § 3214(3) which permits suspension of

A pupil who is insubordinate, or disorderly, or whose conduct otherwise endangers the safety, morals, health or welfare of others.

It is further noted that suspensions in excess of five days are subject to a full panoply of procedural due process measures. N.Y.Ed.Law § 3214(3)(c). Plaintiffs do not challenge the school regulation, the statute or the procedural means employed in imposing the suspensions here. N.Y.Ed.Law § 3214(3)(d), (e). The details concerning the imposition of discipline were finalized by defendants Butler and Miller on Wednesday, January 31.

The suspensions were effective Thursday, February 1, and terminated Wednesday, February 7. The students resumed classes on Thursday, February 8. The students were personally contacted by Dr. Butler on Thursday, February 1, and told of the sanctions and the reasons for them. The parents of Donna Thomas, John Tiedeman and David Jones met with Dr. Butler on Thursday and Friday, at which time the sanctions and explanations were again furnished. A formal letter, dated February 4, was sent to each parent.

This letter, written by Dr. Butler with the collaboration of Mr. Miller, characterized "Hard Times" as being "morally offensive, indecent and obscene." He gave the same appraisal in his testimony at the court hearing. It further provided that "a reasonable Granville person" would reach that conclusion. Moreover, it was stated that "Hard Times" was "particularly inappropriate" in the context of a school which houses students in grades 7–12. Finally, it was stated that it was "inconceivable" that the paper "could be judged to have any redeeming social value in this community."

Another letter, dated February 4, 1979, was sent to Mr. Mager from Granville District Principal Miller. Mr. Miller's account of this letter was that it was intended merely as a summary of their discussions regarding his involvement with "Hard Times." The letter did state:

Assuming that all you have reported is true, in my opinion your professional judgment was lacking of the maturity and soundness I would have expected of you.

Upon the students return to school, the sanction of the segregated study halls was dropped for the sound reason it would attract too much attention to students already involved in a federal case. As previously noted, this Court enjoined the sanction of writing an essay on obscenity. My stated observation was that the Supreme Court is having great difficulty writing on that subject. The only consequences remaining from these sanctions is that plaintiff Thomas has lost her Senior Privileges; and, that a copy of the letter sent to the parents will be retained in the file of each student. In my judgment, there could possibly be serious and irreparable consequences from such a record, even though the defendants Miller and Butler stated that the letter does not become part of the student's permanent record and is removed from the files upon the students leaving school.

The parties have devoted considerable attention to the question of obscenity. Plaintiffs presented an affidavit of Morris I. Berger, Professor of Education of the State University of New York, Albany. Dr. Berger also testified at the hearing and was qualified as an expert in the fields of educational administration, educational psychology and curriculum. He concluded that no competent school administrator would claim that the reading of "Hard Times" by Junior and Senior high school students would disrupt the educational process; there is no necessary causal relation between reading "Hard Times" and harm to a student's educational development; and, that such judgments or predictions are not supported by any evidence in the empirical studies of human behavior.

The defendants have submitted three affidavits in opposition. Dr. John G. Zeis, Chief School Officer of the Hudson Falls Central School District, read "Hard Times"

and concluded that to permit publications of this nature would foster a breakdown of discipline in rural school districts where students, teachers and their respective families frequently socialize outside of the classroom environment; that permitting publications of this nature would be disruptive of the educational process due to disputes that would be triggered among parents/taxpayers who adhere to a broad range of religious persuasion; and, that publications such as "Hard Times" would be "particularly damaging in view of the special sensitivity of youngsters at the junior high school level."

Jack V. Irion, Superintendent of Schools for the Queensbury Union Free School District, read "Hard Times" and concluded that libelous and/or obscene materials serve no educational purpose; that slurs and innuendo of members of the student body destroy positive self-concepts and values that are integral to the educational process; and, that school authorities, representing parents of all students, have the responsibility to regulate the content and distribution of student publications.

William B. Wetherbee, Chief School Officer of the South Glens Falls Central School District, read "Hard Times" and concluded that it would be disruptive to the educational process and damaging to pupils, particularly at the junior high school level; that although publications with similar content are available outside of school, distribution through school channels would be harmful due to the obscene content; that school administrators have an obligation to serve the entire community; and, that given the pluralistic nature of the community served, permitting such publications in school can only serve to polarize the community with a concomitant disruption of the school program.

As previously noted, the plaintiffs seek declaratory and injunctive relief. More particularly, their amended complaint seeks a declaration that the seizure of "Hard Times" and the subsequent suspensions arising out of its publication, violated the First and Fourteenth Amendments; that threats of future seizure and punishment arising out of future issues of "Hard Times" violates the First and Fourteenth Amendments; and, that requiring publication wholly off school grounds violates the First and Fourteenth Amendments.

Plaintiffs' request for injunctive relief seeks to restrain defendants from imposing any disciplinary action for the production and distribution of "Hard Times." Plaintiffs also seek mandatory injunctive relief directing defendants to return all issues which were seized by the defendant, Butler; the expungement of all references to the incident from plaintiffs' school records; and, to permit future sales and distribution of "Hard Times" on school grounds.

Finally, plaintiffs' amended complaint sets forth a claim for attorneys fees pursuant to the authority of 42 U.S.C. § 1988, as amended.

Plaintiffs argue that the following theories support their claims for relief: 1) expression which is offensive but not obscene is protected by the First Amendment; 2) the First Amendment does not create distinctions between "in-school" and "off-school" as a basis for regulating expression; and, 3) the absence of specific regulations directed toward the subject of student publications renders defendants' actions in violation of the First Amendment.

## DISCUSSION

■ The standards governing the issuance of injunctive relief in the Second Circuit have received thoughtful commentary and discussion, *see* Mulligan, Forward—Preliminary Injunction in the Second Circuit, 43 Brooklyn L.Rev. 831 (1977); *see also Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72, 73–74 (2d Cir. 1979), and, as recently restated:

clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., supra,* at 72. *Accord, Caulfield v. Board of Education,* 583 F.2d 605, 610 (2d Cir. 1978); *New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 750, 755 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1358–59 (2d Cir. 1976).

■ For purposes of this case, it must be noted that plaintiffs bear a heavier burden of persuasion "where the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond." *Medical Society of New York v. Toia,* 560 F.2d 535, 538 (2d Cir. 1977). And, where plaintiffs seek mandatory injunctive relief, there is a "traditional reluctance" to grant such relief. *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 441–42, nn. 2, 3, 4 (2d Cir. 1977).

As previously noted, this Court has serious misgivings regarding the plaintiffs' claims that the action taken by the school administrators implicates any of the plaintiffs' fundamental First Amendment rights. To my mind, the conduct throughout was nothing more than an appropriate exercise of the educational authorities' discretion to impose discipline upon insubordinate students. Nevertheless, for purposes of this discussion, there are high level First Amendment cases that I believe support the decision herein.

■ As a threshold matter, this Court does not deem it necessary to become entangled in the illusive concept of obscenity. The Court is on firmer ground in its reliance upon the principles enunciated in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Tinker* affords a framework for examining student rights of free expression measured against the comprehensive authority of school officials to prescribe and control conduct in the schools. In regulating or prohibiting student expression, the burden rests upon school officials to:

demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities. *Id.* at 514, 89 S.Ct. at 740. *Accord, Trachtman v. Anker,* 563 F.2d 512, 517 (2d Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978); *Shanley v. Northeast Independent School District,* 462 F.2d 960, 970–71 (5th Cir. 1972); *Eisner v. Stamford Board of Education,* 440 F.2d 803, 807 (2d Cir. 1971).

*Tinker* also made it clear that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," 393 U.S. at 508, 89 S.Ct. at 737; and, that to justify a curtailment of expression, the school officials must be able to show that their action was "caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompanies an unpopular viewpoint." 393 U.S. at 509, 89 S.Ct. at 738.

It is clear that the "reasonable forecast" premise of *Tinker* does not require school administrators to wait for potential harm to occur prior to taking some protective action. Similarly, given the special and unique environment of our elementary and secondary public school systems, the exercise of the right of expression by the students in those settings is subject to certain constraints which are more restrictive than those normally imposed upon First Amendment freedoms.

To be sure, it appears that the content of "Hard Times," and, the use of school property in its creation, were the major factors in the decision to impose discipline upon the students. Nevertheless, this Court's discussion proceeds upon the premise that at least some portions of "Hard Times" constituted "protected speech." It would be difficult to disagree with the appraisal that "Hard Times" is not in good taste and filthy, particularly so, in light of the lead editorial on masturbation.

Plaintiffs' First Amendment arguments place considerable reliance upon the school authorities value judgments concerning "Hard Times." In doing so, they overlook

several important facts which appear on the record.

First, it is evident that as a consequence of Assistant Principal Reed's meeting with John Tiedeman prior to the publication of "Hard Times," the students were cautioned that disciplinary measures could be taken for publication of a newspaper where school property was involved in its production, and, where the use of student names would cause personal embarrassment to the named students. The Court therefore finds that the students were warned that disciplinary conduct could be imposed for publication of a newspaper based on the use of school facilities in its production as well as its content.

Of far greater significance are certain facts which reveal that the students so-called expression precipitated events which underscore that their conduct was potentially disruptive to discipline in the educational system of this rural community. The Court deems the following events important. As noted, the first copy of the paper surfaced in the school on Wednesday, January 24. Given the fact that school-wide examinations were scheduled for Thursday and Friday, defendants Butler and Miller sensibly refrained from disrupting the administration of these exams. The consequence of this delay was that for five days—January 24–28—Mrs. Beverly Tatko, President of the Board of Education, became aware of "Hard Times" when her son brought a copy home. She was shocked by its content as were the parents of the plaintiff students. She realized that the publication had come from students in the Granville Junior-Senior High School.

During her meeting with defendants Butler and Miller on January 29, she stated that if the latter did not share her sentiments, then perhaps they would be reluctant to do anything about it. She suggested that inasmuch as nothing had been done as yet, perhaps a meeting of the Board of Education should be scheduled. Although Mrs. Tatko may not have perceived that the incident was primarily one for concern of the Board; nevertheless, it is a fair assess-

ment of the record that Mrs. Tatko was firmly convinced that disciplinary action should be taken against the students involved, and, to that end, she would have sought the consensus of the entire Board. Arguably, however, her legitimate and obvious concern was with a perceived disruption of discipline in the school.

This assessment is also reinforced by the inquiry directed to Dr. Butler by John Tiedeman's mother on February 1, the first day of suspension. She inquired about the school officials' failure to stop publication of the newspaper.

■ In sum, it is my judgment that plaintiffs have failed to make a clear showing of likelihood of success on the merits of their *Tinker* arguments. The prohibition of "Hard Times," and the punishment of the students for its publication, I find were reasonable restraints upon expression which proceeded from insubordinate conduct in light of prior warnings; and, the potential disruption of discipline proceeding from such insubordination.

Plaintiffs' remaining contention that the absence of specific regulations governing student publications is impermissible per se, may be dealt with summarily. Their reliance upon *Shanley v. Northeastern Independent School District, supra,* 462 F.2d 960 and *Eisner v. Stamford Board of Education, supra,* 440 F.2d 803, is misplaced. These cases do not suggest, nor does the Constitution require, a particularized rule extending to every conceivable aspect of high school student conduct before school administrators can discipline.

*Eisner* and *Shanley* do not mandate that a school board promulgate a particular policy regarding student publications. However, where a school board does elect to promulgate such policies, these cases do require that such policy statements conform to the standards governing overbreadth, vagueness and Due Process.

In light of plaintiffs' failure to make a clear showing of likelihood of success on the merits of their First Amendment contentions, it follows that plaintiffs have also

failed to make a clear showing of some threat of irreparable harm. *See Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., supra.*

Indeed, at this stage of the litigation, most of the sanctions imposed by the defendants have either been terminated, withdrawn or enjoined. It is true that Donna Thomas has lost her Senior Privileges, although this Court has not been informed whether those privileges may have been restored.

At the conclusion of the preliminary injunction hearing, I stated my concern with the entry of the letter of discipline upon the student records. I stated that such records could irreparably harm these students later in life as they seek any type employment or entry into college or public service. There was some discussion concerning an offer by defendants to voluntarily expunge the record of these letters; however, these discussions did not result in any definite decision in that regard. I believe expungement should be carefully considered again.

The Court regards these "blemishes" as unfortunate, and they are the result of an error of judgment by young high school students. At this stage of the litigation, however, the Court declines to direct expungement.

It is becoming increasingly evident that today's high school students bear little resemblance to their counterparts of a generation ago. In any event, in recognition of the myriad and vital responsibilities that school authorities undertake, the federal courts are instructed to heed the salutary principle that the administration of the public schools is primarily one for local concern. The defendants herein exercised their discretionary authority in a proper manner consonant with specific constitutional guarantees; therefore, there is no basis or constitutional grounds for the challenge to their exercise of discretion and judgment. *See Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The decisions were properly within their supervisory power to control the conduct of the students in the Granville Junior-Senior High School.

It is in deference to these principles that the Court has avoided the question of obscenity. The parties have presented affidavits which draw opposing conclusions as to what impact "Hard Times" may have on junior and senior high school students. The courts are generally ill-equipped to decide questions of this nature; and, are on firmer ground by applying, whenever possible, an "ascertainable jural principle." Friendly, The Courts and Social Policy: Substance and Procedure, 33 U. of Miami L.Rev. 21, 37 (1978). *See also* Moynihan, Social Science and the Courts, 54 Public Interest 12 (1979).

Plaintiffs' motion for a preliminary injunction is denied and dismissed. The foregoing memorandum-decision constitutes this Court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.Pro.

It is so Ordered.

### On Motion for Final Injunction

In a twenty page memorandum-decision and order dated May 2, 1979, I denied and dismissed a motion by the plaintiffs for a preliminary injunction. The details of the fact finding from the affidavits and depositions submitted, and the evidence developed at an evidentiary hearing, led me to the conclusion that there was not sufficient showing of any First Amendment violations that would warrant the drastic relief of preliminary injunction that was mandatory in several of its aspects. Claimed violations of the Due Process Clause asserted in the original complaint had been withdrawn.

■ Attorney Richard Emery now files a motion for a Final Injunction pursuant to Fed.R.Civ.Proc. 65(a)(2). It is my recollection that I did not formally state or order for the record at the evidentiary hearing on the application for the preliminary injunction that the trial could be advanced and consolidated with the hearing on the application. This position was taken due to the opposition of the defendants' attorney to such consolidation. As alternative relief in the present motion, consolidation on the merits pursuant to Rule 65(a)(2) is requested.

The supporting affidavit of attorney Emery states that plaintiffs have no more evidence to present. Attorney H. Wayne Judge states the same position in regard to submission of further evidence and stands upon the record made on the preliminary injunction application. He does not approve the consolidation of the proceedings on the merits under Rule 65(a)(2), but, as expected, does oppose the grant of final permanent injunction herein.

The only problem I see in the grant for the final injunction decision on the merits is that a Notice of Appeal has been filed before this motion was filed and served. Attorney Emery states this was done to preserve plaintiffs' appellate rights, and the Notice of Appeal filed will be amended or withdrawn to reflect the Court's final judgment. The question is whether the filing of the Notice of Appeal deprives the District Court of the power and jurisdiction to rule upon this motion. This is my first experience with a motion of this kind. Appeal lies of right from a refusal of a preliminary injunction under 28 U.S.C. 1292(a)(1). The usual course is to follow through with this appeal. The Circuit Court, if it sees fit, on its own may consider the merits of the case and order dismissal of the action. *See* Law of Federal Courts, 3rd Ed., p. 513; *Aerojet-General Corp. v. American Arbitration Ass'n,* 478 F.2d 248, 252–253 (9th Cir. 1973).

By reason of the concern that I may be intruding upon appellate court jurisdiction to govern and limit its appellate procedures, I shall grant the alternative relief requested, to which there is no opposition, and advance the hearing on the application for preliminary injunction for consolidation with trial on the merits. I do state that inasmuch as there is no further evidence to be presented by either side, my findings and conclusions would be the same as expressed in my decision of May 2, 1979. I would find that the plaintiffs are not entitled to the permanent injunction they seek because First Amendment violation would not be proven by the necessary preponderance of evidence. My judgment would remain firm that the decisions of the school authorities were properly within their supervisory power to control the conduct of the students and did not violate First Amendment rights and privileges. The grant of the alternative relief is made in the interests of practicality.

The motion is granted to that extent only, otherwise denied.

It is so Ordered.