Bobby HALL et al., Plaintiffs,

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants.**

**Civ. A. No. 79–0117–P.**

United States District Court,
S. D. Alabama, S. D.

Aug. 20, 1980.

The defendants are the Board of School Commissioners of Mobile County (Board), Alabama, and the six members of the Board sued in their individual and official capacities.

The plaintiffs attack four policies of the Board, two relating to the distribution of literature on school premises, and two relating to visitors on school premises. They contend that the policies contain vague and subjective standards, and violate the First Amendment on their face, and that the policies are applied in an arbitrary and discriminatory fashion so as to inhibit the plaintiffs' exercise of their First Amendment rights. They contend that the policies are applied to permit some organizations and not others to communicate with and among teachers employed by the defendants, to permit the communication of some ideas and not others, and to prevent the MCEA from communicating among its members, in violation of the Equal Protection clause of the Fourteenth Amendment. The plaintiffs request injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the alleged violations of their First and Fourteenth Amendment rights and of 42 U.S.C. § 1983.

In support of these charges, the evidence offered by the plaintiffs consisted of the defendants limiting the: (1) use of school public address systems for announcements; (2) use of mailboxes for dissemination of literature; (3) holding of informal conversations and passing out literature; (4) wearing of "No" buttons; and (5) the inadequacy of administrative appellate review of decisions by principals and superintendents.

Larry T. Menefee, Mobile, Ala., for plaintiffs.

Robert C. Campbell, III and Frank G. Taylor, Mobile, Ala., for defendants.

## OPINION AND ORDER

PITTMAN, Chief Judge.

This cause was tried by the court without a jury.

The action was filed by Bobby Hall, Leona Brent, and Shirley Banks, for themselves and as representatives of a class composed of "all persons who are now, or may in the future be, employed as teachers by defendants," and of a subclass composed of "all members of the principal class who are also members of the Mobile County Education Association (MCEA), and those who may in the future be eligible for membership in that organization."

## FINDINGS OF FACT

The subject matter which is the genesis of this dispute arises out of the admirable goal of the defendants to upgrade student achievement and teacher competency and the understandable concern of job security by the teachers and their professional organization, MCEA, including the implicit fear that black teachers will by reason of

racial discrimination bear the brunt of the burden of improvement by termination.

## AGREED FACTS

The plaintiffs are teachers employed by the defendants, and are members of the MCEA. Ms. Banks is immediate past president of the MCEA and was president of the organization at the time this action was filed.

Three of the policies which are the subjects of this action, KIA, KIB, and KM, were adopted by the defendants in their present form on June 26, 1974. Policy GBRBB was adopted in its present form on April 13, 1977. On March 5, 1979, the defendants adopted a procedure expanding the prerogatives of staff administrators pursuant to policy GBRBB.

The policies and procedures of the defendants require that anyone wishing to distribute literature or visit a school must first receive written approval from the Deputy Superintendent (Dep. Supt.), formerly described as the Assistant Superintendent for local school administration. Dr. Ed White has served in that capacity during the times relevant to this action. After receiving approval from the Dep. Supt., approval must then be received from each individual school principal.

## FINDINGS BY THE COURT

With regard to the maintenance of this action as a class action, the court incorporates by reference the facts discussed in the recommendation of the magistrate of July 31, 1979, and adopted by the court in its order of August 11, 1979. The defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole." *Fed.R. Civ.P.* 23(b)(2).

The Mobile County school system consists of approximately 87 schools, with 87 principals, over 3000 teachers, and 66,000 students. The schools range from elementary to high school levels; among the largest of the schools, Murphy High School serves some 2400 students. The system is governed by the defendant Board, consisting of its president and five members. Through policies promulgated by the Board, the day—to—day operation of the system is carried out by the superintendent, several assistant or deputy superintendents, and at the local level by principals.

## I. DISTRIBUTION OF LITERATURE

The two policies relating to the distribution of literature on school campuses are KIA, "Political Campaign Materials," and KIB, "Special Interest Materials." Policy KIA provides:

"All material *political or sectarian* in nature distributed on any school campus shall have prior approval of the Assistant Superintendent of Administration." (Emphasis added.)

Policy KIB provides:

"Distribution of *special interest* materials in the local school shall have prior approval of the Assistant Superintendent of Administration." (Emphasis added.)

As noted in the Agreed Facts, these policies were administered by Dr. Ed White, Dep. Supt. The superintendent, Dr. Abe Hammons, also has the implied authority to administer the policies, upon his own motion or upon the request of the Dep. Supt. Although formally control of distribution of materials is centralized in the Dep Supt., in practice the principals exercise discretion in determining what may or may not be distributed on their campuses. There are no written criteria, standards or instructions to guide principals in their decisions; as a result, the evaluation of materials, and the types of materials which are in fact permitted, vary significantly from school to school.[1]

---

1. None of the supervisors considers that he has the authority to deny a member of the Board the right to distribute materials on a campus, although the policies do not by their terms exclude members from their application. The superintendent, Dr. Hammons, assumed that the Board had the right to distribute whatever it wished for Board and school business.

The standards applied by the administrators are alike in one respect: they rest expressly upon a consideration of the content of the materials sought to be distributed. For Dr. White, as well as the principals questioned, the content of the materials serves not only to identify materials subject to the policies, but also to make choices among them. Dr. White, charged with primary responsibility for approving materials, said that permission depended on how a point of view might be stated, or why it was stated, and from the perspective of the effect on the teacher, whether it was designed to interfere with daily operations, or to cause distraction or disruption. Dr. White defined "political" materials as those tending to cause confrontation in schools; Principal William Michaels defined "sectarian" material as "biased."

For purposes of identifying materials subject to the policies, differences also appear in the definitions which the supervisor and principals use of the words "political," "sectarian," and "special interest." "Political," for Dr. White and Principal Sousa, includes material expressing a "point of view" or dealing with teacher competency testing. For Principal Michaels, however, an election form for MCEA elections is not political material. Principal Sousa defines "sectarian" to include material from special groups such as religious groups, the KKK, the NAACP, NOW, or the John Birch Society; Principal Michaels defines special interest material as having a "special purpose" or coming from a "specific organization." Dr. White defines special interest material as that coming from persons in business for personal gain, such as advertisements. Deputy Superintendent Larry Newton, who took over Dr. White's duty of approving materials after the period relevant to this action, defines special interest material as that "benefit[ting] a select few." More generally, Principal Michaels would exempt magazines from the policies based on "good common sense"; Principal Sousa would exempt newspapers for the same reason.

One factor prompting this action was the exclusion from many campuses of materials on the subject of teacher competency testing which teachers sought to distribute. This subject has been strongly and bitterly contested since it was first proposed some years ago. The plaintiffs introduced four documents concerning teacher competency testing, two distributed by Board members, and two written by the MCEA.

Plaintiffs' Exhibit 8 is a letter of January 30, 1979, to teachers from Board President Alexander expressing his opinion on teacher competency testing. Mr. Alexander goes on to express a further opinion on the representation of teachers by the MCEA:

"The only official word that is heard from the teachers, comes from the professional organizations. They have steadfastly opposed any kind of testing and have threatened to "sue us morning, noon and night" if any teachers are dismissed. Most of the teachers that I talked to say they do not support this "stonewall" attitude. The problem is, these teachers never attend their organizations' meetings and allow a handful of members to dictate policy.

"For instance, Dr. Hanebuth is able to say he speaks for two thousand teachers and he is able to spend thousands of dollars of membership dues to defend *any* teacher who is dismissed. If you disagree with the things Dr. Hanebuth is saying and the concept of defending all teachers, then you have a *duty* to attend the meetings and voice your opposition."

Plaintiffs' Exhibit 10 is a "Position Paper" of February 8, 1979, from Board Member Drago. For the most part the paper is a reasoned statement of Ms. Drago's position on teacher competency testing. The paper also contains a challenge to the validity of the contrary argument:

"I feel compelled to issue a statement at this time because of the intense emotional state pervading our system, a condition that I believe can be brought under control when the parties involved examine the situation with logic and reason.

"Teachers spend a great deal of time and effort helping students learn to apply critical thinking skills. They teach stu-

dents to distinguish between fact and fiction, to always search for the truth, to resist over—reacting, to weigh both sides of the question, to recognize propaganda, and to beware of inflammatory words. Today I want to encourage those very same teachers to ask themselves if they are applying the same skills to the teacher—testing issue.

"I have a feeling that many teachers have fallen victim to partial truths and emotional language. Some have, perhaps, unintentionally, been a party *to distribution of rumor.*" (Emphasis added.)

Plaintiffs' Exhibit 5 is an undated flyer prepared by the MCEA between February 8 and 23, 1979. In a combination of pictures, regular, and oversize type, it urges teachers to oppose the imposition of teacher competency testing. The flyer states, "The pressure begins" (illustrated by a line drawing of a head being squeezed by a large C—clamp), "the president speaks" (drawing of an American Indian sending smoke signals). The flyer then quotes what is apparently a news release which discusses the Board's plan to begin testing and the teachers' vote in opposition, and urges teachers to "Stick together." It notes Ms. Drago's position paper, referring to her as "Mom," and in response, states "NO NO NO" in oversize type. Although emphatic and evidently written with a sense of indignation, the flyer does not advocate illegal action, disruption of the educational process, or any action other than opposition to teacher competency testing. It does not suggest any means by which the opposition should be expressed. By referring to Ms. Drago as "Mom," and by implying through the signal fire that Mr. Alexander's statements are hot air or smoke, the flyer could be considered demeaning to those persons. Its random distribution on the school premises invited student participation.

Plaintiffs' Exhibit 7 is a memorandum dated February 23, 1979, from Dr. William Hanebuth, Executive Director of the MCEA, to teachers. It reports the efforts of the MCEA in opposing teacher competency testing, lists acts by the Board, supervisors and principals which were perceived as efforts to put "pressure" on teachers, and generally urges teachers to present a united front in opposition to testing. The memorandum does not advocate any action other than opposition to testing, and does not suggest any means of opposition, apart from noting that "your association had advocated before the Board" an improved teacher evaluation system. In tone it lacks some of the rhetoric in the Alexander letter and is scarcely different from the Drago paper.

At the time that these documents were prepared, the Board had not made a final decision on teacher testing. The documents were advocating positions in a decision—making process rather than obedience or disobedience to a Board policy or rule.

The Alexander letter was distributed on school campuses. The Drago paper was distributed to teachers by means of the schools' mailbox systems. One teacher, Leona Brent, was told that she could not distribute the MCEA flyer on her campus. She had not sought permission to distribute the flyer, because she had only one copy, and did not intend to distribute any flyers. There have been reprimands for distributing MCEA materials. Principal Michaels refused permission for the flyer to be distributed on his campus.

Principal Michaels stated that he permitted the Alexander letter and the Drago paper to be displayed or distributed on his campus. He "would have" refused permission for the Hanebuth memorandum, however, because it put "pressure on educators" and "incite[d] professionals to do things that they would not normally do." When asked what things they might do, he stated, "strikes." Principal Michaels went on to note that he would try to avoid controversial literature, which hurt the educational program. He did not feel that the Alexander letter or the Drago paper was controversial.

Dr. White similarly would have denied permission to distribute the MCEA flyer. He gave two reasons: first, that the flyer attacked Mr. Alexander, second, that the

flyer attempted to avoid Board instructions, and "attempt[ed] to incite teachers" to defy directions. He further noted that the flyer would distract teachers from the responsibility for which they were hired, to teach in the classroom, and cause them "to spend time which the Board is paying for thinking about this," and "to follow directors or outside persons."

The "special interest" materials provided for in policy KIB were considered by all witnesses to include brochures and advertisements from persons selling goods and services, such as insurance or pots and pans. Principal Sousa "usually" distributed these materials for salesmen. Ronald E. Smith, a life insurance salesman, was generally able to leave materials in teachers' lounges or to have them placed in teachers' mailboxes. This was an unequal application of the policy.

## II. VISITORS TO SCHOOL CAMPUSES

The two policies relating to visitors on school campuses are GBRBB, "Structuring the School Day," and KM, "Visitors to the Local School."

Policy GBRBB provides, in pertinent part:

"The school day shall be defined as the time when classes are in session and when faculty and in–service meetings are being held.

.        .        .        .        .

"All persons requesting to visit schools to interpret, sell and/or promote products or services must receive a letter of introduction from the assistant superintendent in charge of local school administration (the assistant superintendent may deny the request for a letter of introduction based upon his investigation of the request) to the local school principal who has the prerogative of approving or denying the request to visit the school.

"In emergency situations as determined by the teacher, principal and the Division of Personnel, arrangements can be made for a conference with a representative of a teacher organization.

.        .        .        .        .

"All schools shall have the school doors open for a minimum of eight (8) consecutive hours each work day. The day for professional personnel will include:

a. time assigned for instructional situations

b. time assigned for planning and conference

c. time assigned for student activities

d. time assigned for supervisory activities other than classroom instruction

e. faculty meetings or in–service meetings after the time students are dismissed and beyond the normal school closing time

"All professional faculty members are required to be at their stations of duty no later than fifteen (15) minutes before school begins and to leave no earlier than fifteen (15) minutes after the school day ends."

Policy KM provides, in pertinent part:

"All persons not assigned to a school shall report directly to the office when visiting in a school.

"The local school principal shall within approved systemwide policies develop and disseminate procedures governing individuals visiting in schools.

"Final authority in visitation to the local school shall reside within the decision of the principal or responsible designee, keeping in mind the system's obligation is to the safety welfare, and education of children."

Taken together, policies GBRBB and KM establish control of school campuses on a 24–hour basis. GBRBB covers the "school day" or "instructional day," roughly from 7:30 a. m. to 3:30 p. m.; KM covers the other hours. A procedure promulgated under policy GBRBB spells out in more detail the process for requesting admission to a campus and for appealing adverse decisions, without time limitations, as well as several unrelated details of school administration. A parallel procedure was adopted on March 5, 1979, under policy KM. The objective is legitimate and worthwhile.

The administration of these policies is a "shared responsibility" of the Dep. Supt. or the superintendent and the local school principal. The Dep. Supt. issues a "letter of introduction" to the would–be visitor, who then requests permission of the principal to enter the campus. No principal may grant permission without this letter. With the letter, the principal's discretion to grant or deny permission is very broad. There are no guidelines issued under these policies, and the practice varies from school to school, permission being granted or denied because of special conditions prevailing at the school, but also because of the individual principals' views on the visitor's organization.

Dr. White testified that visitors to schools are not permitted to meet with teachers during the instructional day, under policy GBRBB, but that a principal might permit such a meeting at the school after the instructional day under policy KM. Policy GBRBB provides that a representative of a teacher organization may meet with a teacher during the instructional day if there is an emergency. Dr. White further stated that visitors, including sales persons, were not permitted to meet with teachers during the instructional day unless there was an emergency.

The policy, according to him, did not authorize visitors to speak with teachers when they are in the teachers' lounge or on their lunch break.

The language of policy GBRBB does not expressly provide that visitors may not speak or meet with teachers during the instructional day. It does provide that,

"Upon request of the Superintendent through the Division of Local School Administration, the principal shall certify whether any sales persons, persons who are advocates of employee organizations or special groups advocating special causes have been authorized to use any of the instructional time, including faculty or in–service meeting time.

"All schools shall have the school doors open for a minimum of eight (8) consecutive hours each work day."

Similarly, the procedure promulgated under policy GBRBB provides:

"Principals shall keep a log of all persons requesting to visit during the instructional day. The principal may be called upon to certify if anyone or who was given permission, not on the faculty to use any instructional time."

The version of policy GBRBB in force prior to April 13, 1977, provided that upon request a principal "shall certify that no sales person, persons who are advocates of employee organizations . . . have been authorized to use any of the instructional time . . . ." It further provided that principals could approve the use of certain persons "who are involved in the learning process."

The court concludes that the Board policy, insofar as the Board and the central administration were concerned, was that visitors were not to meet with teacher during the instructional day. The custom and usage among principals often varied widely from this policy. The central administration did not follow this policy in one case, which involved unusual circumstances and was apparently a conciliatory gesture. In permitting certain MCEA representatives called "uniserve directors" to enter campuses to speak with teachers, Dr. Hammons, the superintendent, wrote on February 13, 1979:

"The bearer of this letter, [blank for name] has permission to visit the individual schools of Mobile County for the purpose of discussing with teachers any professional educational concerns which might be brought to their attention by the individual instructor. Under no circumstances shall conferences with teachers be held during the teachers class time; under no circumstances shall meetings be held during the school day as stated in Board Policy GBRBB."

The letter clearly contemplated individual conferences with teachers during the instructional day when the teachers were not in class, although meetings with groups could not be held then.

Numerous sales persons were permitted to meet with teachers during lunch periods and "off periods." This included a representative of Lamar Life, an insurance company, and persons selling pots and pans, cancer insurance, and magazines. Ronald E. Smith, an insurance salesman, testified that he was permitted to meet with teachers during lunch and breaks. A representative of Amway made a presentation to teachers in a teachers meeting at Baker High School, a period included in the instructional day." MCEA representatives were not always denied permission to meet with teachers. Dr. Hanebuth was permitted to meet teachers in the lounge, and to have lunch with them. In February 1979, a number of "uniserve directors" were given letters of introduction, and were permitted to visit in some schools.

As noted above, principals have broad discretion to permit or deny permission to visit a school. This discretion is so broad and uncontrolled that a principal might refuse permission to a representative of a teacher organization solely on the basis of that principal's opinion that membership in that organization was not helpful to a teacher's professional development or was not otherwise advantageous.

Principal Michaels testified that he would never let a representative from the MCEA such as Dr. Hanebuth, or a representative of the American Federation of Teachers, visit on his campus. He stated that the campus was closed on a 24-hour basis, and that any visits during the instructional day were "obstructive." Although this appears on its face consistent with the official policy, Principal Michaels went on to state that insurance salesmen were less disruptive than Dr. Hanebuth, and explained that by virtue of the fact that he was a uniserve director, Dr. Hanebuth was disruptive. It was clear from Principal Michaels' demeanor and tone that the ground of his denial of permission to an MCEA representative was or would be the nature and function of that organization.

Another principal, Ms. Ethel McDavid, permitted Dr. Hanebuth to speak with her elementary teachers after school, because she considered that it would be "fair to let them talk with him." Plaintiffs' Exhibit 12 at 28–29. She did not permit visitors to speak with teachers during the instructional day because elementary teachers are required to be with students for the entire day. *Id.* at 28. She permitted visitors to meet with teachers after school if they provided "something that I think would be helpful to the teachers." *Id.* at 29.

Principal Sousa decides whether or not to permit a visitor to enter the campus based on whether it is worthwhile to the school as a whole, and in considering the effect on the students.

Dr. Garfield Bright, former Executive Director of the MCEA, was denied permission to enter some schools when he had a letter of introduction from the Dept. Supt. The circumstances of these denials do not appear.

### III. OTHER EVIDENCE

The plaintiffs offered evidence on the policy with regard to the use of the public address systems at two schools. At Mary Montgomery High School, non–school organizations other than the MCEA are permitted to make announcements over the public address system. Ms. Mary Wooten stated that she was not permitted to use the system to announce MCEA meetings before 3:15 in the afternoon, after most teachers are gone, and some 15 minutes after students have been excused.

At John Shaw High School, Mr. William Franklin was suspended for two weeks, one without pay, for making an announcement over the system. He stated that he had had use of the system in the past to make announcements regarding MCEA meetings and elections. On the occasion in question, Mr. Franklin asked permission of Ms. Sadie Smith to use the system. Mr. Franklin referred to Ms. Smith as both an instructional "specialist" and an instructional "supervisor." The precise nature of her authority does not appear. Mr. Franklin told her that he wished to make an announcement of "news of interest to" MCEA mem-

bers. Mr. Franklin then proceeded to discuss the questions of a teacher's right to have an uninterrupted 35 minutes for lunch, and of teacher competency testing. With regard to the latter issue, Mr. Franklin testified that he felt that the teachers should let themselves be heard, and that they should not allow themselves to be castigated without responding.

On several occasions, teachers have been denied permission to distribute literature through teachers' mailboxes. No evidence was offered that the teachers attempted to follow policies KIA and KIB, by requesting permission from the Dep. Supt. Mr. Glenn Burnham was reprimanded for attempting to distribute an announcement of an MCEA meeting. He had not requested permission to distribute the announcement, but stated that he was following the procedure customary at his school. He was told that this was "no longer possible." Ms. Linda Wooten testified that she was not able to distribute MCEA literature at her school. She did not mention specific incidents where permission was refused.

In March 1979, Ms. Wooten was denied permission to hold an MCEA meeting at Mary Montgomery High School with other faculty members after school. She stated that such meetings had been permitted in the past, on several occasions. Ms. Cassie W. Jackson, a Title I reading program instructor at Hamilton Elementary School testified that she was present with 12–15 other teachers at the "teachers' station," a central resource room for Title I teachers at 3:10 p. m., some 25 minutes after students had left. Several of the teachers were discussing teacher competency testing; the principal accused Ms. Jackson of calling an unauthorized meeting. As a result, she refrains from speaking to other teachers on MCEA matters while at school, but has them call her at home.

Evidence was presented concerning the wearing of "No" buttons by teachers. The buttons refer to opposition to teacher competency testing. Ms. Leona Brent, a teacher at E. R. Dickson Elementary School, was told to remove her button. Principal Sousa, then principal of Theodore High School, wrote a memo to all teachers on February 14, 1979, which stated:

"We have a rule at Theodore that no student is to wear any sign or insignia of protest while on this campus. I would hope that teachers can see that if they wear an insignia on campus it is a form of protest and is a poor learning experience for students. On one hand we tell the students not to do something and we do the same thing ourselves. I am hoping that teachers will use good judgment and refrain from setting a poor example for students."

He also pointed out to teachers at a teachers' meeting that it was "bad professionally" to wear the buttons in front of students, as it was setting a bad example. It does not appear that any teacher was ordered to remove a button, however, it is clear such action was disapproved.

The process of the one appeal under policy GBRBB was very lengthy. There are three steps: (1) a letter to the Dep. Supt.: if denied, (2) a letter to the superintendent or his designee: if denied, (3) a letter to the Board. Dr. Hanebuth employed the process on one occasion regarding an attempt to visit Rain High School. He wrote his first letter on March 8, 1977. His appeal at the Board level was postponed on two or three occasions, and was assigned to a Mr. Sessions for further investigation on August 24, 1977. Dr. Hanebuth's last act was to write to then Assistant Superintendent LoDestro on September 13, 1977. He never received a decision on the appeal, after six months of pursuing it. The procedure and its application are totally inadequate.

Throughout the period leading up to this action, it is clear that both the teachers and the Board and administration have been provoked and antagonized, on numerous occasions, by one another. Teacher competency testing has been vigorously debated among teachers, and their views have been made known to the Board and the administration. The MCEA is concerned that Board policy renders it unable to provide service to its members with regard to their

employment. The Board is concerned that numerous violations of its policy by teachers and MCEA representatives have an adverse effect upon the climate of schools for education. The Board policies include the concern about securing schools campuses for the protection of students. Administrators have noted that the presence of illegal drugs on campuses and a rape at Toulminville High School may be traced to the presence of unauthorized and uncontrolled visitors.

In February and March, 1979, and since, teacher competency testing has been a major issue in the school system. There followed several flagrant violations of acceptable school policy by MCEA, MCESPO, and the teachers. The MCEA requested that the Alabama Education Association and the National Education Association send "uniserve directors" to Mobile to assist in getting information to teachers on the subject of testing. During February six "uniserve directors", through Dr. Hanebuth, requested letters of introduction in order to speak with teachers. Dr. Hammons discussed visitor policies with the directors, and the expectation that there would be no disturbance at the schools. He wrote these "uniserve directors" letters. They were then permitted to enter schools. Dr. Hammons received reports of numerous disturbances at the schools which were visited. The visitors were removed from those campuses.

In late February or early March some 16 "uniserve directors" were sent to Mobile to participate in MCEA contact with teachers. They attempted to enter schools without receiving letters of introduction. This occurred at Dodge Elementary School, Grand Bay Elementary, Mae Eanes Middle School, Davidson High School and Theodore High. As a result of these unauthorized attempts to visit schools, the Board called a special meeting, held on March 5, 1979, at which procedures were adopted under policy KM giving the administration control over school campuses on a 24-hour basis.

On March 6, 1979, Dr. Hanebuth wrote to Dr. Hammons requesting letters of introduction for some 16 "uniserve directors."

None of these persons was introduced personally to Dr. Hammors. Aware of the unauthorized visits, and based upon the Board's action the previous night, Dr. Hammons denied the request for letters.

On March 7, 1979, two persons who identified themselves as Shumaker and Ward appeared at Theodore High School and requested to speak with teachers at the faculty meeting scheduled for that afternoon. They did not have letters of introduction. Two persons named Steve Shumaker and Joe Ward are listed in Dr. Hanebuth's request for letters of March 6; it is likely that these are two of that number. Principal Sousa, then principal at Theodore, was involved in getting students onto buses at the end of the day. He tried to explain to the men that letters of introduction were required, and told them that if they would wait until he got the buses off, he would speak with them. He explained that they could not go the faculty meeting. The two men said that they would not leave.

Principal Sousa held the faculty meeting. At the end of the meeting, he found the two men in the hallway passing out literature. He asked them what it was, and received no reply. He told them that what they were doing was wrong. Their attitude was belligerent.

Mr. Glenn Burnham's distribution of literature and Mr. William Franklin's use of the public address system have already been discussed. It was clearly a violation of Board policy for Mr. Franklin to use the system to argue a position on the public address system on the testing issue. It was clear to the court that he knew that this was a violation before he used the system.

Ms. B. C. Terry is a field director for the Mobile County Education Support Personnel Organization (MCESPO), which represents approximately 540 Board employees who work as bus drivers, secretaries, or in food service. In spring 1979 MCESPO received complaints from employees at Mae Eanes Middle School; Ms. Terry was sent to speak with the employees who had grievances. Whether this was before or after the Board had promulgated the procedures

under policy KM does not appear. Ms. Terry did not request permission of the principal, Mr. Michaels, before entering the school. She explained that it was after school hours, and that he was not present. She met with the employees in the cafeteria of the school, where they congregated when they saw her drive up.

Dr. Garfield Bright, former Executive Director of the MCEA, has distributed literature on school campuses without requesting permission from the Dep. Supt.

One of the most flagrant violations of Board policy by teachers has been the practice among some teachers of discussing teacher competency testing with students, of bringing MCEA literature on that subject into the classroom, and of otherwise involving students in the dispute between the Board and the teachers. The topic was discussed in classes whose subject matter bore no relation to testing. A related subject of student competency testing was an important issue among students at the time.

Control over distribution of materials and literature on school campuses, control over appeals to students by the wearing of "No" buttons, the use of the loudspeaker system for discussion of issues by teachers, is essential for the maintenance of a climate conducive to education. Control over visitors to campuses, including whether, when, and under what circumstances they will be permitted, is likewise essential not only for the maintenance of a proper educational climate, but also for the protection of students' health and lives. Principals and administrators must have information on the identity of a visitor and the purpose of his visit, for such reasons.

### CONCLUSIONS OF LAW

The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1343(3) and (4).

■ Underlying the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment where First Amendment rights are concerned, is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide–open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). Teachers, like students, do not become subject to unlimited regulation by the state upon entering the school campus. *See, e. g., Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266, 279 (1972); *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969); *Shanley v. Northeast Indep. School Dist.,* 462 F.2d 960, 967 (5th Cir. 1972). School administrators are themselves charged with "a profound national commitment," the education of young people. A court in delineating the guarantees of the First Amendment on school campuses does not derogate from this important responsibility. It is well established, however, that this responsibility must be exercised within constitutional bounds. *Ingraham v. Wright,* 525 F.2d 909 (5th Cir. 1976), *aff'd,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Boykins v. Fairfield Board of Ed.,* 492 F.2d 697, 702 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975). "[T]he Constitution can be no more loosely interpreted because the motivations behind its infringement may be benign." *Shanley v. Northeast Indep. School Dist.,* 462 F.2d at 976.

■■ The state has a compelling interest in the proper functioning of its school system, *Burnside v. Byars,* 363 F.2d 744 (5th Cir. 1966), and the "special characteristics of the school environment" permit reasonable and narrowly defined limitations upon the exercise of First Amendment freedoms. *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. at 506, 89 S.Ct. at 736, 21 L.Ed.2d at 737; *see Healy v. James,* 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266, 279 (1972). The burden of justifying any limitations falls upon the state. *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. at 509, 89 S.Ct. at 738, 21 L.Ed.2d at 739; *Shanley v. Northeast Indep. School Dist.,* 462 F.2d at 969.

### I. Policies KIA and KIB

■ Policies KIA and KIB are vague and overbroad, and have been administered in an unconstitutional manner, in violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983.

The plaintiffs seek to exercise what has been termed "pure speech." *Tinker v. Des Moines Indep. School Dist.*, 393 U.S. at 505, 89 S.Ct. at 735, 21 L.Ed.2d at 737; *Cox v. Louisiana*, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484 (1965); *see Lindsey v. Bd. of Regents*, 607 F.2d 672, 674 (5th Cir. 1979). The Board has sought to regulate that speech based upon its content: whether it is "political or sectarian," or "special interest material." This is not regulation of "time, place, or manner" of expression. *See Police Dep't v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972).

■ Content regulations are not per se invalid. In a public forum, the state may restrict expression which is obscene, consists of fighting words, or which poses an imminent danger of grave evil. *See Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, 1134–35 (1949). In the school context, further "reasonable" restraints on expression are permitted, with an increasingly heavier burden as the restraint "focuses on the content of materials that are not obscene, libellous, or inflammatory." *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 971. " '[C]ontroversy' is, as a matter of constitutional law never sufficient in and of itself to stifle the views of any citizen. . . ." *Id.*

Policies KIA and KIB contain insufficient standards, purposes, or guidelines by which school authorities may be guided in determining what literature may be distributed on school campuses. They fall far short, therefore, of the requirement that a restraint on expression must be "bounded by clear and precise standards" which are susceptible of objective measurement. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448, 456 (1975); *see Keyishian v. Board of Regents*, 385 U.S. 589, 603–04, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629, 641 (1967). Under these policies there exists an unfettered discretion over the exercise of First Amendment freedoms which is unacceptable. *See International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 822–23 (5th Cir. 1979); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 977.

■ A law or policy is unconstitutionally vague if people "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926); *International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d at 830. Although it is true that a school regulation need not be drawn with the precision of a criminal code, at least where no penalty is involved, *Jenkins v. Louisiana St. Bd. of Education*, 506 F.2d 992 (5th Cir. 1975), measures affecting First Amendment rights require a greater degree of specificity because of the fundamental rights involved. *E. g., Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).

Here we have college trained educators straying all over the field by their various interpretations of the written policies.

The evidence demonstrates that people of common intelligence not only must but in fact have disagreed as to the meaning and application of the words of the policies, "political or sectarian," and "special interest." No indication of the meaning of "distribution" is to be found in the policies. *See Baughman v. Freienmuth*, 478 F.2d 1345, 1349 (4th Cir. 1973); *Eisner v. Stamford Bd. of Ed.*, 440 F.2d 803, 811 (2d Cir. 1971). The supposed ill to be prevented by the policies, "disruption," is neither stated as a standard for decision nor defined. *See Nitzberg v. Parks*, 525 F.2d 378, 383 (4th Cir. 1975); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 976.

Policies KIA and KIB are also overbroad, because they may be applied to, and thus deter protected expression. *See Grayned v. Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972). Under *Shanley*, expression may be prohibited only

"if it materially and substantially interferes with school activities or with the rights of other students or teachers, or if the school administration can demonstrate reasonable cause to believe that the expression would engender such material and substantial interference."

462 F.2d at 970. Policies KIA and KIB reach all political, sectarian or special interest materials, whether it has or may have such an effect, or not. The policies have been implemented by an unequal application depending on the person or organization applying.

■■■■ Prior submission rules are permissible. This aspect of the policies does not offend the First Amendment. *Sullivan v. Houston Indep. School Dist.*, 475 F.2d 1071, 1076 (5th Cir. 1973); *Pervis v. LaMarque Indep. School Dist.*, 466 F.2d 1054 (5th Cir. 1972). A prior submission rule may not, however, operate to stifle in an unconstitutional manner the contents of the materials submitted. *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 969.

Policies KIA and KIB violate the First and Fourteenth Amendments and 42 U.S.C. § 1983 as they are applied, because they are administered in an arbitrary and inconsistent manner, and have been administered with the effect, if not the intent, of curtailing expression by members of the MCEA.

■■■■ Although substantial interference with the educational process is a basis for restricting the exercise of First Amendment freedoms, disagreement with the philosophy being expressed is emphatically not. *See Healy v. James*, 408 U.S. at 187–89, 92 S.Ct. at 2349–50, 33 L.Ed.2d at 283–84; *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 971. The differing treatment by Dr. White and Principal Michaels of Plaintiffs' Exhibits 5, 7, 8, and 10 demonstrates that precisely this type of restriction occurs under the policies. This court can discern, and the Board has shown, no difference between the disruptive effect, actual or potential, of the Board's communications and some of MCEA's communications on

the same subject. They differed only in the positions taken. Apart from whether the Board should be able to communicate its opinion on an issue on "its own" property, the differing treatment is not supported by any state interest, and demonstrates that some of the MCEA material has been unconstitutionally restricted based upon its content.

The commission of discretion to the various principals to admit or exclude materials from their campuses, without explicit guidelines, has resulted in administration of the policies which is both arbitrary and inconsistent. The policies do not limit a principal's discretion to the standards set forth in *Shanley* and other cases, but leave him with unlimited discretion. This discretion has been exercised solely on the basis of whether a principal agreed or disagreed with the statements made. This violates the First Amendment and 42 U.S.C. § 1983, as discussed above. The inconsistencies in administration found from school to school violate the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. *See Police Dep't v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

■■■■ There is no evidence that the presence of some of the MCEA materials on the school campuses has caused "material and substantial disruption" of the educational process. There is evidence, however, that some materials concerning teacher competency testing have found their way into classrooms, where the subject was discussed notwithstanding that it was unrelated to the subject matter of the course. The wearing of "No" buttons and unrestricted distribution of MCEA flyers invited student attention to a teacher's interested position. The Board clearly may ensure that classrooms are used for teaching the prescribed curriculum, and not as a means of disseminating the MCEA's position on issues concerning their employment. *Pred v. Board of Public Instr.*, 415 F.2d 851 (5th Cir. 1969); *see Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971); *Ni-*

*gosian v. Weiss,* 343 F.Supp. 757 (E.D.Mich. 1971); *cf. Buckel v. Prentice,* 410 F.Supp. 1243, 1247 (S.D.Ohio 1976), *aff'd,* 572 F.2d 141 (6th Cir. 1978) (use of students as messengers). *But cf. Kingsville Indep. School Dist. v. Cooper,* 611 F.2d 1109, 1113 (5th Cir. 1980) (certain classroom activity is protected speech). Protection of the curriculum is a legitimate state interest; it may be accomplished, however, by means less intrusive on First Amendment rights than are policies KIA and KIB. Without such a "narrow tailoring" the policy is unconstitutional. *Police Dep't v. Mosley,* 408 U.S. at 101–02, 92 S.Ct. at 2293–94, 33 L.Ed.2d at 220.

## II. Policies GBRBB and KM

Although physical presence in a public building with a specific public use is not pure speech, it may be protected by the First Amendment. *Shanley v. Northeast Indep. School Dist.,* 462 F.2d at 971 n.8; *Hurley v. Hinckley,* 304 F.Supp. 704 (D.Mass.1969), *aff'd mem. sub nom. Doyle v. O'Brien,* 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970) (per curiam). The problem here is that neither of these policies contains any standards to guide the exercise of discretion by the Dep. Supt. or principals. Under policy GBRBB, the Dep. Supt. "may deny the request for a letter of introduction based upon his investigation of the request"; the local principal "has the prerogative of approving or denying the request to visit the school." Policy KM provides that:

> "Final authority in visitation to the local school shall reside within the decision of the principal or responsible designee, keeping in mind the system's obligation is to the safety, welfare, and education of children."

The statement in policy KM is not sufficiently precise to serve as a guide to administrators in making the determinations required under *Shanley* and other cases.

Beyond the lack of standards, these policies are reasonably clear and understandable, and are therefore not vague. The policies are overbroad, however, as the lack of standards causes them to reach activity protected under the "Material and substantial disruption" rule of *Shanley. See* 462 F.2d at 976–77. The court concludes that policies GBRBB and KM violate the First Amendment on their faces.

The plaintiffs have failed to establish a prima facie case in support of their contention that policies GBRBB and KM violate the constitution as applied. There is evidence which suggests that such violations might have occurred. Principal Michaels, for example, testified that he would not permit MCEA representatives to visit his campus because of the very fact that they were MCEA representatives. Where 87 principals exercise the broad and unlimited discretion permitted under the policies, it becomes more likely that unequal treatment would occur.

During the February and March 1979 period, when a number of "uniserve directors" were in Mobile, their requests for letters of introduction and tenure on campuses were handled in a constitutional manner. In his meeting with the six persons who received Dr. Hammons' letter of February 13, 1979, Dr. Hammons explained his expectations that no disruptions should occur on campuses. This is the sort of determination contemplated by *Shanley* and other cases. The correct standard was later applied, in a deliberative and considered fashion, when the conduct of the "uniserve directors" became "materially and substantially disruptive" of the schools' programs and some proceeded on campus without application to do so.

## III. Adequacy of Appellate Review

Policies restricting the exercise of First Amendment rights must contain a mechanism for appellate review which provides for "a brief and reasonable time" for decision and review; the court in *Shanley* noted that:

> "The occasions calling for the exercise of free speech are fleeting, and lack of clarity or a delay in implementation of screening regulations carry [sic] the inherent danger that the exercise of speech might

be chilled altogether during the period of its importance."

462 F.2d at 977. The failure of the policies to provide for such an appellate mechanism is a violation of due process. *Id.* at 977–78; *see Baughman v. Freienmuth,* 478 F.2d 1345 (4th Cir. 1973); *Eisner v. Stamford Board of Ed.,* 440 F.2d 803, 810 (2d Cir. 1971).

Such review should be provided for promptly and acted on promptly.

*IV. Promulgation of Other Regulations*

■ The plaintiffs have requested that the court order the defendants to promulgate constitutional policies for the distribution of literature on and visitors to school campuses. Alabama law does not require the Board to promulgate policies in pursuit of its statutory obligations. *See* Alabama Code §§ 16–10–1 to 16–10–11 (1975). Further, the court "should not lightly interfere with the day–to–day operation of schools." *E. g., Augustus v. School Board,* 507 F.2d 152, 155 (5th Cir. 1975); *Wright v. Houston Indep. School Dist.,* 486 F.2d 137 (5th Cir. 1973), *cert. denied,* 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974). The court is hopeful that the Board, in a redrafting of its policies, will do so in good faith and in conformity with the instructive body of constitutional law which has developed in this area.

ORDER

It is therefore ORDERED, ADJUDGED, and DECREED:

(1) that policies KIA and KIB are violative of the First and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983, both on their faces and as they have been applied;

(2) that policies GBRBB and KM are violative of the First and Fourteenth Amendments to the Constitution, and 42 U.S.C. § 1983, on their faces;

(3) that the defendants, their agents, employees, assigns, successors in office, and any and all others actively participating with them, are hereby enjoined from applying or enforcing policies KIA, KIB,

GBRBB, and KM as presently drafted against the plaintiffs or the classes they represent;

(4) that the plaintiffs are entitled to costs and reasonable attorneys' fees.

Costs are taxed to the defendants. If the parties are unable to agree on a reasonable attorneys' fee, the plaintiffs may file an appropriate motion.